# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| HUMAN GENOME SCIENCES, INC.,<br>Plaintiff<br><br>v.<br><br>AMGEN INC. & IMMUNEX CORP.,<br>Defendant | Civil Action No. 07-780 (SLR) |

## DECLARATION OF A. ANTONY PFEFFER

I, A. Antony Pfeffer, hereby declare as follows:

1.      I am an attorney-at-law of the State of New York and a member of Kenyon &

Kenyon LLP, attorneys for plaintiff Human Genome Sciences, Inc.

2.      Annexed hereto are true and correct copies of the following documents:

Exhibit A          Webpage showing the interference file contents for Interference No.
                   105,240 printed from the www.uspto.gov website.[1]

Exhibit B          Ni Substantive Motion 3 (To Change Benefit Accorded for the
                   Contested Subject Matter), filed Dec. 7, 2005 in Interference No.
                   105,240.

---

[1]      I note that the U.S. Patent and Trademark Office website lists the document names and the page counts for documents, however, for unknown reasons, the page count indicated does not always accurately reflect the number of pages for the corresponding document.

I declare under penalty of perjury that the foregoing is true and correct.

A. ANTONY PFEFFER

DATED:  May 23, 2008

# EXHIBIT A



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | *e*Business | eBiz alerts | News | Help

**Boards & Counsel** > **BPAI** > **Efiling for Board of Patent Appeals and Interferences**

View Public Interference Documents

File Interference Documents

This site contains PDF documents click here to download Adobe Reader **Download PDF Plugin**

Select Search Method: ⓘ [Interference Number ▾]  [105240]  [Go]

| Interference No | Style Name | Application Numbers Involved |
|---|---|---|
| 105240 | RAUCH v. NI | 09378045 v. 09565009 |

- File Wrapper
- Bibliographic Info
- File Contents

Help

### Interference File Contents

Click on Document Type to view documents    [Display Exhibits]

| Download Files | Document Number | Document Type | Document Name | Document Filing Date | Page Count | Document Entered/Filed By |
|---|---|---|---|---|---|---|
| ☐ | 142 | OTHER INCOMING CORRESPONDENCE | NOTICE OF JUDICIAL REVIEW UNDER 37 C.F.R. 41.8(b) | 12/12/2007 | 113 | BPAI |
| ☐ | 141 | JUDGMENT | JUDGMENT - ORDER TO SHOW CAUSE - Bd.R. 202(d) | 11/20/2007 | 3 | BPAI |
| ☐ | 140 | OTHER INCOMING CORRESPONDENCE | HGS'S RESPONSE TO PAPER 139 | 10/29/2007 | 4 | BPAI |
| ☐ | 139 | ORDER | ORDER - MISCELLANEOUS - BD.R. 104(a) | 10/16/2007 | 3 | BPAI |
| ☐ | 138 | OTHER INCOMING CORRESPONDENCE | PARTY NI'S REQUEST FOR ADVERSE JUDGMENT TO INITIATE REVIEW UNDER 35 U.S.C. 146 | 10/09/2007 | 3 | BPAI |
| | | | HUMAN GENOME SCIENCES,INC. | | | |

| | 137 | OTHER INCOMING CORRESPONDENCE | NOTICE OF CHANGE IN LEAD COUNSEL AND BACKUP COUNSEL | 09/24/2007 | 5 | BPAI |
|---|---|---|---|---|---|---|
| ☐ | 136 | OTHER INCOMING CORRESPONDENCE | JOINT STIPULATION OF SETTEMENT DISCUSSION AFTER SUBSTANTIVE MOTIONS DECISION | 09/24/2007 | 4 | BPAI |
| ☐ | 135 | REDECLARATION | REDECLARATION - BD.R.203(RES) | 08/24/2007 | 3 | BPAI |
| ☐ | 134 | ORDER | ORDER - PRIORITY TIMES - Bd.R. 104(c) | 07/27/2007 | 6 | BPAI |
| ☐ | 133 | DECISION ON MOTIONS | DECISION-MOTIONS-Bd.R. 125(a) | 07/26/2007 | 73 | BPAI |
| ☐ | 132 | LIST OF EXHIBITS | CONSOLIDATED EXHIBIT LIST OF EXHIBITS FILED IN PATENT INTERFERENCES 105240; 105380; AND 105381 | 09/22/2006 | 12 | BPAI |
| ☐ | 131 | TRANSCRIPT | JOINT SUBMISSION OF TRANSCRIPT | 09/22/2006 | 96 | BPAI |
| ☐ | 130 | APPEARANCE RECORD | APPEARANCE RECORD | 09/07/2006 | 0 | BPAI |
| ☐ | 129 | ORDER | ORDER MISCELLANEOUS BD.R. 104(a) | 09/05/2006 | 0 | BPAI |
| ☐ | 128 | OTHER INCOMING CORRESPONDENCE | RAUCH DEMONSTRATIVE EXHIBITS (FOR ORAL ARGUMENT OF SEPTEMBER 7, 2006) | 08/31/2006 | 0 | BPAI |
| ☐ | 127 | OTHER INCOMING CORRESPONDENCE | RAUCH NOTICE OF TRANSCRIPTION OF ORAL ARGUMENT | 08/31/2006 | 0 | BPAI |
| ☐ | 126 | OTHER INCOMING CORRESPONDENCE | NOTICE OF SERVICE OF DEMONSTRATIVE EXHIBITS | 08/30/2006 | 0 | BPAI |
| ☐ | 125 | OTHER INCOMING CORRESPONDENCE | NOTICE OF FILING PAPER COPY OF RECORD | 08/02/2006 | 0 | BPAI |
| ☐ | 124 | OTHER INCOMING CORRESPONDENCE | OBJECTIONS TO THE ADMISSIBILITY OF RAUCH EXHIBIT 1104 (CONTINUED IN 103001) | 07/10/2006 | 0 | BPAI |
| ☐ | 123 | OTHER INCOMING CORRESPONDENCE | NOTICE OF FILING OF RECORD FOR DECISIONS ON MOTIONS | 07/10/2006 | 0 | BPAI |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | 121 | **OTHER INCOMING CORRESPONDENCE** | NOTICE OF FILING OF THE RECORD FOR DECISIONS ON MOTIONS | 07/07/2006 | 0 | BPAI |
| ☐ | 119 | **REPLY** | REPLY 8 | 07/03/2006 | 0 | BPAI |
| ☐ | 118 | **REPLY** | REPLY 7 | 07/03/2006 | 0 | BPAI |
| ☐ | 117 | **ORDER** | ORDER - MISCELLANOEUS - Bd.R 104(a) | 06/29/2006 | 0 | BPAI |
| ☐ | 116 | **OTHER INCOMING CORRESPONDENCE** | NI EXHIBIT LIST | 06/28/2006 | 0 | BPAI |
| ☐ | 115 | **OTHER INCOMING CORRESPONDENCE** | NI NOTICE OF SERVICE OF CASE LAW AND CD'S ON PARTY ADAMS | 06/28/2006 | 0 | BPAI |
| ☐ | 114 | **OTHER INCOMING CORRESPONDENCE** | NI NOTICE OF SERVICE OF NI RECORD ON COUNSEL FOR IMMUNEX | 06/28/2006 | 0 | BPAI |
| ☐ | 113 | **OTHER INCOMING CORRESPONDENCE** | RESUBMISSION OF NI MOTION 7 TO EXCLUDE EVIDENCE (APPENDIX A TO NI ERRATA TO MOTION 7) | 06/28/2006 | 0 | BPAI |
| ☐ | 112 | **OTHER INCOMING CORRESPONDENCE** | NI ERRATA TO MOTION 7 EXCLUDE EVIDENCE | 06/28/2006 | 0 | BPAI |
| ☐ | 110 | **OPPOSITION** | OPPOSITION 7 | 06/22/2006 | 0 | BPAI |
| ☐ | 109 | **OTHER INCOMING CORRESPONDENCE** | RESPONSE TO OBSERVATIONS ON DEPOSITION OF GAVIN SCREATON | 06/22/2006 | 0 | BPAI |
| ☐ | 108 | **OPPOSITION** | OPPOSITION 8 TO RAUCH SUBSTANTIVE MOTION 8 | 06/22/2006 | 0 | BPAI |
| ☐ | 107 | **OTHER OUTGOING CORRESPONDENCE** | ORDER-EXPUNGING PAPERS 101-103 BD.R.7(A) | 06/20/2006 | 0 | BPAI |
| ☐ | 106 | **OTHER INCOMING CORRESPONDENCE** | NI EXHIBIT LIST | 06/13/2006 | 0 | BPAI |
| ☐ | 105 | **OTHER INCOMING CORRESPONDENCE** | NI REQUEST FOR ORAL HEARING | 06/13/2006 | 0 | BPAI |
| ☐ | 104 | **OTHER INCOMING CORRESPONDENCE** | NI OBSERVATIONS ON CROSS EXAMINATION OF GAVIN R. SCREATON | 06/13/2006 | 0 | BPAI |
| ☐ | 100 | **OTHER INCOMING** | NI MOTION 7 TO | 06/13/2006 | 0 | BPAI |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | **CORRESPONDENCE** | EXCLUDE EVIDENCE | | | |
| ☐ | 99 | **OTHER INCOMING CORRESPONDENCE** | RAUCH EXHIBIT LIST, EXHIBITS 1001-1096 (ACCOMPANYING TPS MOTIONS TO EXCLUDE) | 06/13/2006 | 0 | BPAI |
| ☐ | 98 | **OTHER INCOMING CORRESPONDENCE** | RAUCH REQUEST FOR ORAL ARGUMENT | 06/13/2006 | 0 | BPAI |
| ☐ | 97 | **OTHER INCOMING CORRESPONDENCE** | RAUCH MISCELLANEOUS MOTION 8 (TO EXCLUDE NI'S EVIDENCE) | 06/13/2006 | 0 | BPAI |
| ☐ | 96 | **OTHER OUTGOING CORRESPONDENCE** | DECISION-REHEARING-BD.R.125 (C) | 06/08/2006 | 0 | BPAI |
| ☐ | 95 | **OTHER INCOMING CORRESPONDENCE** | RAUCH NOTICE OF DEPOSITION OF GAVIN SCREATON | 05/26/2006 | 0 | BPAI |
| ☐ | 94 | **MOTION** | JOINT STIPULATION EXTENDING TIME PERIODS 5 AND 6 | 05/10/2006 | 0 | BPAI |
| ☐ | 93 | **OTHER OUTGOING CORRESPONDENCE** | ORDER MISCELLANEOUS-BD.R.104 | 05/05/2006 | 0 | BPAI |
| ☐ | 92 | **OTHER INCOMING CORRESPONDENCE** | JOINT STIPULATION EXTENDING TIME PERIOD 5 | 05/04/2006 | 0 | BPAI |
| ☐ | 91 | **OTHER INCOMING CORRESPONDENCE** | EXHIBIT LIST, EXHIBITS 1001-1088 | 04/24/2006 | 0 | BPAI |
| ☐ | 90 | **REPLY** | REPLY 7 | 04/24/2006 | 0 | BPAI |
| ☐ | 89 | **REPLY** | REPLY 6 | 04/24/2006 | 0 | BPAI |
| ☐ | 88 | **REPLY** | REPLY 5 | 04/24/2006 | 0 | BPAI |
| ☐ | 87 | **REPLY** | REPLY 4 | 04/24/2006 | 0 | BPAI |
| ☐ | 86 | **REPLY** | REPLY 3 | 04/24/2006 | 0 | BPAI |
| ☐ | 85 | **REPLY** | REPLY 2 | 04/24/2006 | 0 | BPAI |
| ☐ | 84 | **OTHER INCOMING CORRESPONDENCE** | EXHIBIT LIST | 04/21/2006 | 0 | BPAI |
| ☐ | 83 | **REPLY** | REPLY 6 | 04/21/2006 | 0 | BPAI |
| ☐ | 82 | **REPLY** | REPLY 4 | 04/21/2006 | 0 | BPAI |
| ☐ | 81 | **REPLY** | REPLY 3 | 04/21/2006 | 0 | BPAI |
| ☐ | 80 | **MOTION** | JOINT STIPULATION ON CHANGE OF TIME PERIOD 4 | 04/06/2006 | 0 | BPAI |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | 79 | **OTHER INCOMING CORRESPONDENCE** | NI NOTICE OF DEPOSITION UNDER 37 C.F.R. 41.157(C) | 03/29/2006 | 0 | BPAI |
| ☐ | 78 | **OTHER OUTGOING CORRESPONDENCE** | DECISION REQUEST FOR REHEARING BD.R.125(C) | 03/16/2006 | 0 | BPAI |
| ☐ | 77 | **OTHER INCOMING CORRESPONDENCE** | REQUEST FOR REHEARING REGARDING NI SUBSTANTIVE MOTION 5 | 03/03/2006 | 0 | BPAI |
| ☐ | 76 | **OTHER INCOMING CORRESPONDENCE** | RAUCH EXHIBIT LIST, EXHIBITS 1001-1063 (ACCOMPANYING OPPOSITIONS) | 02/23/2006 | 0 | BPAI |
| ☐ | 75 | **OTHER INCOMING CORRESPONDENCE** | RAUCH OPPOSITION 6 | 02/23/2006 | 0 | BPAI |
| ☐ | 74 | **OTHER INCOMING CORRESPONDENCE** | RAUCH OPPOSITION 4 | 02/23/2006 | 0 | BPAI |
| ☐ | 73 | **OTHER INCOMING CORRESPONDENCE** | RAUCH OPPOSITION 3 | 02/23/2006 | 0 | BPAI |
| ☐ | 72 | **OTHER INCOMING CORRESPONDENCE** | NI EXHIBIT LIST | 02/23/2006 | 0 | BPAI |
| ☐ | 71 | **OTHER INCOMING CORRESPONDENCE** | NI OPPOSITION 7 TO RAUCH RESPONSIVE MOTION 7 | 02/23/2006 | 0 | BPAI |
| ☐ | 70 | **OTHER INCOMING CORRESPONDENCE** | NI OPPOSITION 6 TO RAUCH SUBSTNTIVE MOTION 6 | 02/23/2006 | 0 | BPAI |
| ☐ | 69 | **OTHER INCOMING CORRESPONDENCE** | NI OPPOSITION 5 TO RAUCH SUBSTANTIVE MOTION 5 | 02/23/2006 | 0 | BPAI |
| ☐ | 68 | **OTHER INCOMING CORRESPONDENCE** | NI OPPOSITION 4 TO RAUCH SCUBSTANTIVE MOTION 4 | 02/23/2006 | 0 | BPAI |
| ☐ | 67 | **OTHER INCOMING CORRESPONDENCE** | NI OPPOSITION 3 TO RAUCH SUBSTANTIVE MOTION 3 | 02/23/2006 | 0 | BPAI |
| ☐ | 66 | **OTHER INCOMING CORRESPONDENCE** | NI OPPOSITION 2 TO RAUCH SUBSTANTIVE MOTION 2 | 02/23/2006 | 0 | BPAI |
| ☐ | 65 | **ORDER** | DECISION INTERLOCUTORY MOTIONS BD.R. 125 (b) | 02/16/2006 | 0 | BPAI |
| | | **OTHER INCOMING** | RESPONSE TO NI'S REQUEST FOR RECONSIDERATION | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | 64 | **CORRESPONDENCE** | OF DENIAL MOTION FOR COMPULSION OF TESTIMONY AND DOCUMENTS | 02/10/2006 | 0 | BPAI |
| ☐ | 63 | **OTHER INCOMING CORRESPONDENCE** | JOINT STIPULATION EXTENDING TIME PERIODS 3 AND 4 | 02/08/2006 | 0 | BPAI |
| ☐ | 62 | **OTHER INCOMING CORRESPONDENCE** | RAUCH NOTICE OF DEPOSITION OF GENHONG CHENG | 01/30/2006 | 0 | BPAI |
| ☐ | 61 | **OTHER INCOMING CORRESPONDENCE** | NI EXHIBIT LIST | 01/27/2006 | 0 | BPAI |
| ☐ | 60 | **OTHER INCOMING CORRESPONDENCE** | REQUEST FOR REHEARING RGARDING NI MISCELLANEOUS MOTION 2 UNDER 37 C.F.R. 41.125(C) | 01/27/2006 | 0 | BPAI |
| ☐ | 59 | **ORDER** | ORDER-ADDITIONAL DISCOVERY -Bd.R. 150(c) | 01/12/2006 | 0 | BPAI |
| ☐ | 58 | **OTHER INCOMING CORRESPONDENCE** | RESPONSIVE MOTION 7 | 01/05/2006 | 0 | BPAI |
| ☐ | 57 | **OTHER INCOMING CORRESPONDENCE** | RESPONSIVE MOTION 6 REQUESTING BENEFIT | 01/05/2006 | 0 | BPAI |
| ☐ | 56 | **ORDER** | ORDER-MISCELLANEOUS-Bd.R. 104 | 01/04/2006 | 0 | BPAI |
| ☐ | 55 | **OTHER INCOMING CORRESPONDENCE** | NOTICE OF SERVING PRIORITY STATEMENT | 12/16/2005 | 0 | BPAI |
| ☐ | 54 | **OTHER INCOMING CORRESPONDENCE** | EXHIBIT LIST, EXHIBITS 1001-1037 | 12/08/2005 | 0 | BPAI |
| ☐ | 53 | **OTHER INCOMING CORRESPONDENCE** | CLEAN CPY OF CLAIMS AND BIOTECHNOLOGY SEQUENCES | 12/08/2005 | 0 | BPAI |
| ☐ | 52 | **OTHER INCOMING CORRESPONDENCE** | ANNOTATED COPY OF CLAIMS | 12/08/2005 | 0 | BPAI |
| ☐ | 51 | **OTHER INCOMING CORRESPONDENCE** | PROPOSED AMENDMENT IN APPLICATION 09/378,045 | 12/08/2005 | 0 | BPAI |
| ☐ | 50 | **OTHER INCOMING CORRESPONDENCE** | NOTICE OF FILING PRIORITY STATEMENT | 12/08/2005 | 0 | BPAI |
| ☐ | 49 | **OTHER INCOMING CORRESPONDENCE** | SUBSTANTIVE MOTIO 6 | 12/08/2005 | 0 | BPAI |
| ☐ | 48 | **OTHER INCOMING CORRESPONDENCE** | SUBSTANTIVE MOTION 5 | 12/08/2005 | 0 | BPAI |

| | 47 | OTHER INCOMING CORRESPONDENCE | SUBSTANTIVE MOTION 4 | 12/08/2005 | 0 | BPAI |
|---|---|---|---|---|---|---|
| ☐ | 47 | OTHER INCOMING CORRESPONDENCE | SUBSTANTIVE MOTION 4 | 12/08/2005 | 0 | BPAI |
| ☐ | 46 | OTHER INCOMING CORRESPONDENCE | SUBSTANTIVE MOTION 3 | 12/08/2005 | 0 | BPAI |
| ☐ | 45 | OTHER INCOMING CORRESPONDENCE | SUBSTANTIVE MOTION 2 | 12/08/2005 | 0 | BPAI |
| ☐ | 44 | OTHER INCOMING CORRESPONDENCE | NI NOTICE OF FILING PRIORITY STATEMENT | 12/08/2005 | 0 | BPAI |
| ☐ | 43 | OTHER INCOMING CORRESPONDENCE | NI EXHIBIT LIST | 12/08/2005 | 0 | BPAI |
| ☐ | 42 | OTHER INCOMING CORRESPONDENCE | NI SUBSTANTIVE MOTION 5 (UNPATENTABILITY OF IMMUNEX'S INVOLVED CLAIMS UNDER 35 U.S.C.105 (E) AND/OR 102 (C)/103) | 12/08/2005 | 0 | BPAI |
| ☐ | 41 | OTHER INCOMING CORRESPONDENCE | NI SUBSTANTIV MOTION 4 TO SUBSTITUTE NEW COUNT 2 | 12/08/2005 | 0 | BPAI |
| ☐ | 40 | OTHER INCOMING CORRESPONDENCE | NI SUBSTANTIVE MOTION 3 (TO CHANGE BENFIT ACCORDED FOR THE CONTESTED SUBJECT MATTER) | 12/08/2005 | 0 | BPAI |
| ☐ | 39 | OTHER INCOMING CORRESPONDENCE | STATEMENT REGARDING SETTLEMENT DISCUSSION | 12/05/2005 | 0 | BPAI |
| ☐ | 38 | OTHER OUTGOING CORRESPONDENCE | ORDER-MISCELLANEOUS-BD.R.104 | 11/29/2005 | 0 | BPAI |
| ☐ | 37 | OTHER OUTGOING CORRESPONDENCE | ORDER - MISCELLANEOUS - BD.R. 104(a) | 11/22/2005 | 0 | BPAI |
| ☐ | 36 | OTHER INCOMING CORRESPONDENCE | RAUCH OPPOSITION 2 | 11/22/2005 | 0 | BPAI |
| ☐ | 35 | OTHER OUTGOING CORRESPONDENCE | ORDER-INTERLOCUTORY MOTIONS-BD.R. 125 (B) (IMMUNEX) | 11/15/2005 | 0 | BPAI |
| ☐ | 34 | OTHER OUTGOING CORRESPONDENCE | ORDER-INTERLOCUTORY MOTIONS-BD.R. 125 (B)(HUMAN GENOME SCIENCES) | 11/15/2005 | 0 | BPAI |
| ☐ | 33 | OTHER INCOMING CORRESPONDENCE | NI EXHIBIT LIST | 11/10/2005 | 0 | BPAI |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | 32 | **OTHER INCOMING CORRESPONDENCE** | NI MISCELLANEOUS MOTION 2 | 11/10/2005 | 0 | BPAI |
| ☐ | 31 | **OTHER INCOMING CORRESPONDENCE** | RAUCH EXHIBT LIST, EHBITIS 1001-1013 (FILED WITH RAUCH OPPOSITION 1) | 11/10/2005 | 0 | BPAI |
| ☐ | 30 | **OTHER INCOMING CORRESPONDENCE** | RAUCH OPPOSITION 1 | 11/10/2005 | 0 | BPAI |
| ☐ | 29 | **OTHER INCOMING CORRESPONDENCE** | RAUCH EXHIBIT LIST, EXHIBITS 1001-1012 | 11/07/2005 | 0 | BPAI |
| ☐ | 28 | **OTHER INCOMING CORRESPONDENCE** | RAUCH MISCELLANEOUS MOTION 1 | 11/07/2005 | 0 | BPAI |
| ☐ | 27.025 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.024 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.023 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.022 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.021 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.02 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.019 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.018 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.017 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.016 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.015 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.014 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.013 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.012 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.011 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.01 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.009 | **OTHER INCOMING CORRESPONDENCE** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.008 | **OTHER INCOMING** | EXHIBITS | 11/07/2005 | 0 | BPAI |

| | | | CORRESPONDENCE | | | |
|---|---|---|---|---|---|---|
| ☐ | 27.007 | OTHER INCOMING CORRESPONDENCE | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.006 | OTHER INCOMING CORRESPONDENCE | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.005 | OTHER INCOMING CORRESPONDENCE | EXHIBITS | 12/07/2005 | 0 | BPAI |
| ☐ | 27.004 | OTHER INCOMING CORRESPONDENCE | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.003 | OTHER INCOMING CORRESPONDENCE | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.002 | OTHER INCOMING CORRESPONDENCE | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 27.001 | OTHER INCOMING CORRESPONDENCE | EXHIBIT | 11/07/2005 | 0 | BPAI |
| ☐ | 27 | OTHER INCOMING CORRESPONDENCE | EXHIBIT LIST | 11/07/2005 | 0 | BPAI |
| ☐ | 26 | OTHER INCOMING CORRESPONDENCE | MISCELLANEOUS MOTION 1 (REQUESTING SYNCHRONIZATION OF TIMES AND/OR DELAYED DISCLOURE) | 11/07/2005 | 0 | BPAI |
| ☐ | 25 | OTHER OUTGOING CORRESPONDENCE | ORDER- MISCELLANEOUS BD.R. 104(a) | 11/03/2005 | 0 | BPAI |
| ☐ | 24 | OTHER OUTGOING CORRESPONDENCE | ORDER - MISCELLANEOUS- BD.R. 104(a) | 11/03/2005 | 0 | BPAI |
| ☐ | 23 | OTHER OUTGOING CORRESPONDENCE | ORDER- MISCELLANEOUS- BD.R.104(A) | 11/02/2005 | 0 | BPAI |
| ☐ | 22 | OTHER INCOMING CORRESPONDENCE | NOTICE OF CONFIDENTIAL INFORMATION | 11/01/2005 | 0 | BPAI |
| ☐ | 21 | OTHER INCOMING CORRESPONDENCE | LIST OF INTENDED MOTIONS | 10/27/2005 | 0 | BPAI |
| ☐ | 20 | OTHER INCOMING CORRESPONDENCE | LIST OF INTENDED SUBSTATNTIVE MOTIONS | 10/27/2005 | 0 | BPAI |
| ☐ | 19 | OTHER INCOMING CORRESPONDENCE | ANNOTATED COPY OF CLAIMS | 09/29/2005 | 0 | BPAI |
| ☐ | 18 | OTHER INCOMING CORRESPONDENCE | ANNOTATED COPY OF CLAIMS | 09/29/2005 | 0 | BPAI |
| ☐ | 17 | ORDER | ORDER | 09/27/2005 | 0 | BPAI |
| ☐ | 16 | POWER OF ATTORNEY | POWER OF ATTORNEY | 09/15/2005 | 0 | BPAI |
| | | | COPY OF CLAIMS | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | 15 | **OTHER INCOMING CORRESPONDENCE** | AND BIOTECHNOLOGY SEQUENCES | 09/15/2005 | 0 | BPAI |
| ☐ | 14 | **OTHER INCOMING CORRESPONDENCE** | REQUEST FOR FILE COPIES | 09/15/2005 | 0 | BPAI |
| ☐ | 13 | **REAL PARTY IN INTEREST** | DESIGNATION OF REAL PARTY IN INTEREST | 09/15/2005 | 0 | BPAI |
| ☐ | 12 | **OTHER INCOMING CORRESPONDENCE** | NOTICE OF RELATED PROCEEDINGS | 09/15/2005 | 0 | BPAI |
| ☐ | 11 | **DESIGNATION OF LEAD ATTORNEY** | DESIGNATION OF LEAD AND BACKUP COUNSEL | 09/15/2005 | 0 | BPAI |
| ☐ | 10 | **ORDER** | ORDER-MISCELLANEOUS Bd.R. 104(a) | 09/21/2005 | 0 | BPAI |
| ☐ | 9 | **OTHER INCOMING CORRESPONDENCE** | REQUEST FOR FILE COPIES | 09/15/2005 | 0 | BPAI |
| ☐ | 8 | **OTHER INCOMING CORRESPONDENCE** | CLEAN COPY OF CLAIMS AND SEQUENCE | 09/15/2005 | 0 | BPAI |
| ☐ | 7 | **OTHER INCOMING CORRESPONDENCE** | NOTICE OF CHILD APPLICATIONS | 09/15/2005 | 0 | BPAI |
| ☐ | 6 | **REAL PARTY IN INTEREST** | REAL PARTY-IN-INTEREST | 09/15/2005 | 0 | BPAI |
| ☐ | 5 | **DESIGNATION OF LEAD ATTORNEY** | IDENTIFICATION OF LEAD AND BACKUP LEAD COUNSEL | 09/15/2005 | 0 | BPAI |
| ☐ | 4 | **ORDER** | ORDER-RULE 123(a) | 08/31/2005 | 0 | BPAI |
| ☐ | 3 | **ORDER** | ORDER-MISCELLANEOUS-Bd.R. 104(a) | 08/31/2005 | 0 | BPAI |
| ☐ | 2 | **OTHER OUTGOING CORRESPONDENCE** | STANDING ORDER | 08/31/2005 | 0 | BPAI |
| ☐ | 1 | **NOTICE TO DECLARE INTERFERENCE** | DECLARATION | 08/31/2005 | 0 | BPAI |

**Download selected documents as:**

◉ PDF file with bookmarked papers

◯ ZIP file with individual papers     [ Start Download ]  [ Select All ]  [ UnSelect All ]

**KEY:** 🌐=online business system  💲=fees  📑=forms  🔧=help  ⚖️=laws/regulations  📖=definition (glossary)

*Is there a question about what the USPTO can or cannot do that you cannot find an answer for? Send questions about USPTO programs and services to the* **USPTO Contact Center (UCC)***. You can suggest USPTO webpages or material you would like featured on this section by E-mail to the* **webmaster@uspto.gov***. While we cannot promise to accommodate all requests, your suggestions will be considered and may lead to other improvements on the website.*



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | *e*Business | eBiz alerts | News | Help

Boards & Counsel > BPAI > Efiling for Board of Patent Appeals and Interferences

| Interference No | Style Name | Application Numbers Involved |
|---|---|---|
| 105240 | RAUCH v. NI | 09378045 v. 09565009 |

**The following exhibits were filed for the interference number:- 105240**

**Interference File Contents**

Click on Document Type to view documents          The following Exhibits were filed by BPAI

| Download Files | Document Number | Document Type | Document Name | Document Filing Date | Page Count | Document Entered/Filed By |
|---|---|---|---|---|---|---|
| ☐ | 131.197 | EXHIBIT | TRANSCRIPT OF ORAL ARUGMENT (SEPTEMBER 7, 2006) FILED AS EXHIBIT 2197 | 09/22/2006 | 93 | BPAI |
| ☐ | 122.052 | EXHIBIT | EXHIBIT 2052 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.053 | EXHIBIT | EXHIBIT 2053 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.056 | EXHIBIT | EXHIBIT 2056 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.057 | EXHIBIT | EXHIBIT 2057 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.058 | EXHIBIT | EXHIBIT 2058 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.059 | EXHIBIT | EXHIBIT 2059 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.06 | EXHIBIT | EXHIBIT 2060 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.061 | EXHIBIT | EXHIBIT 2061 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.062 | EXHIBIT | EXHIBIT 2062 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.063 | EXHIBIT | EXHIBIT 2063 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.064 | EXHIBIT | EXHIBIT 2064 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.065 | EXHIBIT | EXHIBIT 2065 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.066 | EXHIBIT | EXHIBIT 2066 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.067 | EXHIBIT | EXHIBIT 2067 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.068 | EXHIBIT | EXHIBIT 2068 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.069 | EXHIBIT | EXHIBIT 2069 | 07/07/2006 | 0 | BPAI |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | 122.07 | **EXHIBIT** | EXHIBIT 2070 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.071 | **EXHIBIT** | EXHIBIT 2071 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.072 | **EXHIBIT** | EXHIBIT 2072 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.073 | **EXHIBIT** | EXHIBIT 2073 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.074 | **EXHIBIT** | EXHIBIT 2074 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.075 | **EXHIBIT** | EXHIBIT 2075 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.076 | **EXHIBIT** | EXHIBIT 2076 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.077 | **EXHIBIT** | EXHIBIT 2077 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.078 | **EXHIBIT** | EXHIBIT 2078 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.079 | **EXHIBIT** | EXHIBIT 2079 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.08 | **EXHIBIT** | EXHIBIT 2080 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.081 | **EXHIBIT** | EXHIBIT 2081 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.082 | **EXHIBIT** | EXHIBIT 2082 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.083 | **EXHIBIT** | EXHIBIT 2083 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.084 | **EXHIBIT** | EXHIBIT 2084 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.085 | **EXHIBIT** | EXHIBIT 2085 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.086 | **EXHIBIT** | EXHIBIT 2086 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.087 | **EXHIBIT** | EXHIBIT 2087 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.088 | **EXHIBIT** | EXHIBIT 2088 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.089 | **EXHIBIT** | EXHIBIT 2089 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.09 | **EXHIBIT** | EXHIBIT 2090 (CONTINUED IN 103001) | 07/07/2006 | 0 | BPAI |
| ☐ | 122.001 | **EXHIBIT** | EXHIBIT 2001 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.002 | **EXHIBIT** | EXHIBIT 2002 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.003 | **EXHIBIT** | EXHIBIT 2003 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.004 | **EXHIBIT** | EXHIBIT 2004 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.005 | **EXHIBIT** | EXHIBIT 2005 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.006 | **EXHIBIT** | EXHIBIT 2006 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.007 | **EXHIBIT** | EXHIBIT 2007 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.008 | **EXHIBIT** | EXHIBIT 2008 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.009 | **EXHIBIT** | EXHIBIT 2009 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.01 | **EXHIBIT** | EXHIBIT 2020 | 07/07/2006 | 0 | BPAI |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | 122.011 | **EXHIBIT** | EXHIBIT 2011 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.012 | **EXHIBIT** | EXHIBIT 2012 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.013 | **EXHIBIT** | EXHIBIT 2013 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.014 | **EXHIBIT** | EXHIBIT 2014 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.015 | **EXHIBIT** | EXHIBIT 2015 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.016 | **EXHIBIT** | EXHIBIT 2016 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.017 | **EXHIBIT** | EXHIBIT 2017 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.018 | **EXHIBIT** | EXHIBIT 2018 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.019 | **EXHIBIT** | EXHIBIT 2019 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.02 | **EXHIBIT** | EXHIBIT 2020 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.021 | **EXHIBIT** | EXHIBIT 2021 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.022 | **EXHIBIT** | EXHIBIT 2022 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.023 | **EXHIBIT** | EXHIBIT 2023 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.024 | **EXHIBIT** | EXHIBIT 2024 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.025 | **EXHIBIT** | EXHIBIT 2025 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.026 | **EXHIBIT** | EXHIBIT 2026 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.027 | **EXHIBIT** | EXHIBIT 2027 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.028 | **EXHIBIT** | EXHIBIT 2028 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.029 | **EXHIBIT** | EXHIBIT 2029 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.03 | **EXHIBIT** | EXHIBIT 2030 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.031 | **EXHIBIT** | EXHIBIT 2031 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.032 | **EXHIBIT** | EXHIBIT 2032 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.033 | **EXHIBIT** | EXHIBIT 2033 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.034 | **EXHIBIT** | EXHIBIT 2034 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.035 | **EXHIBIT** | EXHIBIT 2035 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.036 | **EXHIBIT** | EXHIBIT 2036 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.037 | **EXHIBIT** | EXHIBIT 2037 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.038 | **EXHIBIT** | EXHIBIT 2038 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.039 | **EXHIBIT** | EXHIBIT 2039 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.04 | **EXHIBIT** | EXHIBIT 2040 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.041 | **EXHIBIT** | EXHIBIT 2041 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.042 | **EXHIBIT** | EXHIBIT 2042 | 07/07/2006 | 0 | BPAI |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | 122.043 | **EXHIBIT** | EXHIBIT 2043 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.044 | **EXHIBIT** | EXHIBIT 2044 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.045 | **EXHIBIT** | EXHIBIT 2045 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.046 | **EXHIBIT** | EXHIBIT 2046 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.047 | **EXHIBIT** | EXHIBIT 2047 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.048 | **EXHIBIT** | EXHIBIT 2048 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.049 | **EXHIBIT** | EXHIBIT 2049 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.05 | **EXHIBIT** | EXHIBIT 2050 | 07/07/2006 | 0 | BPAI |
| ☐ | 122.051 | **EXHIBIT** | EXHIBIT 2051 | 07/07/2006 | 0 | BPAI |
| ☐ | 122 | **EXHIBIT** | CONSOLIDATED EXHIBIT LIST OF EXHIBITS IN PATENT INTERFERENCE NOS. 105240; 105380; AND 105381 | 07/07/2006 | 0 | BPAI |
| ☐ | 120 | **EXHIBIT** | EXHIBIT LIST, EXHIBITS 1001-1104 (ACCOMPANYING TP7 REPLY TO MOTION TO EXCLUDE) | 07/03/2006 | 0 | BPAI |
| ☐ | 111 | **EXHIBIT** | EXHIBIT LIST, EXHIBITS 1001-1101 (accompanying TP6 Oppositions to Motions to Exclude) | 06/22/2006 | 0 | BPAI |
| ☐ | 33.011 | **EXHIBIT** | EXHIBITS 2036 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.012 | **EXHIBIT** | EXHIBITS 2037 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.013 | **EXHIBIT** | EXHIBITS 2038 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.014 | **EXHIBIT** | EXHIBITS 2039 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.015 | **EXHIBIT** | EXHIBITS 2040 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.016 | **EXHIBIT** | EXHIBITS 2041 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.001 | **EXHIBIT** | EXHIBITS 2026 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.002 | **EXHIBIT** | EXHIBITS 2027 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.003 | **EXHIBIT** | EXHIBITS 2028 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.004 | **EXHIBIT** | EXHIBITS 2029 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.005 | **EXHIBIT** | EXHIBITS 2030 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.006 | **EXHIBIT** | EXHIBITS 2031 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.007 | **EXHIBIT** | EXHIBITS 2032 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.008 | **EXHIBIT** | EXHIBITS 2033 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.009 | **EXHIBIT** | EXHBITS 2034 | 11/10/2005 | 0 | BPAI |
| ☐ | 33.01 | **EXHIBIT** | EXHIBITS 2035 | 11/10/2005 | 0 | BPAI |
| ☐ | 31.001 | **EXHIBIT** | EXHIBITS | 11/10/2005 | 0 | BPAI |

| | 29.003 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
|---|---|---|---|---|---|---|
| ☐ | 29.003 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.004 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.005 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.006 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.007 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.008 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.009 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.01 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.011 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.012 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.001 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |
| ☐ | 29.002 | **EXHIBIT** | EXHIBITS | 11/07/2005 | 0 | BPAI |

**Download selected documents as:**
◉ PDF file with bookmarked papers
○ ZIP file with individual papers          [ Start Download ]   [ Select All ]   [ UnSelect All ]

# EXHIBIT B

Filed on behalf of:    Party Ni
By:       Jorge A. Goldstein, Esq.
      Eldora L. Ellison, Esq.
      Sterne, Kessler, Goldstein & Fox, P.L.L.C.
      1100 New York Avenue, NW
      Washington, D.C. 20005-3934
      Tel: (202) 371-2600
      Fax: (202) 371-2540

Paper _____

## UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE BOARD OF PATENT APPEALS
## AND INTERFERENCES
(Administrative Patent Judge Richard E. Schafer)

---

Human Genome Sciences, Inc.
Junior Party
(Patent 6,872,568;
Inventors: Jian Ni, Reiner L. Gentz, Guo-Liang Yu, Craig A. Rosen),

v.

Immunex Corp.
Senior Party
(Application 09/378,045;
Inventors: Charles Rauch, Henning Walczak).

---

Patent Interference No. 105,240 (RES)

---

## NI SUBSTANTIVE MOTION 3
### (To Change Benefit Accorded for the Contested Subject Matter)

## I.    Statement of Precise Relief Requested

Party Ni ("Human Genome Sciences" or "HGS") requests that the Board accord HGS the benefit of the following priority applications for the subject matter of count 1 of the present interference and, contingent upon the granting of HGS's SUBSTANTIVE MOTION 4 TO SUBSTITUTE NEW COUNT 2, to accord HGS the benefit of the following priority applications for the subject matter of proposed count 2:

- U.S. Provisional Appl. No. 60/040,846 (the "March 17, 1997 priority application");

- U.S. Provisional Appl. No. 60/054,021 (the "July 29, 1997 priority application");

- U.S. Appl. No. 09/042,583, filed March 17, 1998;

- U.S. Provisional Appl. No. 60/132,498, filed May 4, 1999;

- U.S. Provisional Appl. No. 60/133,238, filed May 7, 1999; and

- U.S. Provisional Appl. No. 60/148,939, filed August 13, 1999.

## II.    The Evidence

The evidence relied upon in support of this motion is set forth as Appendix A to this motion, which is attached hereto.

## III.    Statement of Material Facts

A statement of material facts in support of this motion is set forth as Appendix B to this motion, which is attached hereto.

## IV.    *Argument*

### A.    *Overview*

HGS's involved patent claims the benefit of six priority applications (Fact 1), as shown in Appendix C to this motion.  In the Notice of Allowability for the application that resulted in HGS's involved patent, the Examiner explicitly acknowledged that the March 17, 1997 priority application enables and describes antagonistic antibodies specific for DR5 that are the subject of the count of this interference.  (Fact 2).  Nonetheless, HGS has not been accorded the benefit of any of its priority applications in this interference.  (Fact 3).  In this Motion, Party Ni will demonstrate beyond any question that HGS's priority applications, including its March 17, 1997 priority application, indeed fully enable and describe the contested subject matter of the present interference.  Thus, HGS is entitled to the benefit of its priority applications.

The count generally relates to antibodies that specifically bind to the extracellular domain (ECD) of a receptor molecule known alternatively as DR5, Apo-2, or TRAIL-R2.  The amino acid sequence of DR5 is set forth in HGS's involved patent as SEQ ID NO: 2.  (Fact 4).  DR5 is a death domain-containing member of the tumor necrosis factor receptor (TNFR) superfamily (a "death receptor") and is involved in the induction of apoptosis in cells.  (Fact 5).  The antibodies of the count are specified as being antagonists of the DR5 protein.  (Fact 6).

As explained in detail below, HGS's March 17, 1997 priority application, *inter alia*, (i) provides the complete amino acid sequence of DR5 (SEQ ID NO: 2), (ii) identifies the amino acid residues that correspond to the ECD of DR5, (iii) recognizes that, because of the sequence similarity between DR5 and other death receptors, DR5 is also a death receptor, (iv) teaches

methods for cloning, expressing and isolating DR5 and portions thereof (including the extracellular domain), (v) teaches methods for making and using antagonistic antibodies (*e.g.*, monoclonal antibodies) that specifically bind to the extracellular domain of DR5, (vi) teaches methods for confirming that antibodies that specifically bind to the extracellular domain of DR5 are antagonists of DR5, and (vii) provides clear and practical uses for such antibodies.

Therefore, in view of the disclosure of the March 17, 1997 application and the advanced state of the art relating to the production of antibodies in general, as well as the production of antagonistic antibodies against death receptors in particular, it is clear that HGS's March 17, 1997 priority application provides a fully enabled written description of the subject matter of count 1 and of proposed count 2.

HGS's later filed priority applications, including the July 29, 1997 application, include all of the information from the March 17, 1997 application and provide additional working examples confirming that DR5 induces apoptosis, (Fact 7), and that the extracellular domain of DR5 interacts with the apoptosis-inducing ligand TRAIL. (Fact 8). These examples reinforce the enablement and written description of antibodies that fall within the scope of count 1 and of proposed count 2. Thus, for at least the same reasons that HGS should be accorded the benefit of the March 17, 1997 priority application, HGS should also be accorded the benefit of its later filed priority applications.

**B.      *The Legal Requirements for Being Accorded Benefit of an Earlier Application***

Under 37 C.F.R. § 41.201, "accord benefit" is defined as Board recognition that a patent application provides a proper constructive reduction to practice under 35 U.S.C. § 102(g)(1). "Constructive reduction to practice means a described and enabled anticipation under 35 U.S.C. § 102(g)(1) in a patent application of the subject matter of a count." *Id*.   Therefore, to be accorded the benefit of an earlier application for purposes of priority, a party need only have provided an enabled description of a single species within the scope of the count. *See Scripps Research Institute v. Genentech, Inc.*, 2005 WL 596764 (Bd. Pat. App. & Interf.) (citing *Hunt v. Treppschuh*, 523 F.2d 1389, 187 U.S.P.Q. 426, 429 (CCPA 1975)).

To satisfy the enablement requirement, the specification of a patent application must enable a person of ordinary skill in the art to make and use the claimed invention without undue experimentation. *See In re Wands*, 858 F.2d 731, 737, 8 U.S.P.Q.2d 1400, 1404 (Fed. Cir. 1988).   A specification, however, need not enable information within the knowledge of an ordinary skilled artisan. *See Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1254, 70 U.S.P.Q.2d 1321, 1325 (Fed. Cir. 2004).   In the context of assessing the enablement requirement for monoclonal antibodies specifically, the court in *Wands* stated in its 1988 decision that "the nature of monoclonal antibody technology is that it involves screening hybridomas to determine which ones secrete antibody with desired characteristics.  Practitioners of this art are prepared to screen negative hybridomas in order to find one that makes the desired antibody." *Wands*, 858 F.2d at 740, 8 U.S.P.Q.2d at 1406.

**Ni Substantive Motion 3**
**(To Change Benefit Accorded for the Contested Subject Matter)**
Patent Interference No. 105,240

An application also must describe the subject matter of the count in terms that establish that the party was in possession of the invention, including all of the elements and limitations presented in the count, at the time of the earlier filing. *Hyatt v. Boone*, 146 F.3d 1348, 1353, 47 U.S.P.Q.2d 1128, 1131 (Fed. Cir. 1998). The descriptive text needed to satisfy the written description requirement varies with the nature and scope of the invention at issue, and with the scientific and technologic knowledge already in existence. *Capon v. Eshhar*, 418 F.3d 1349, 1357, 76 U.S.P.Q.2d 1078, 1084 (Fed. Cir. 2005).

The written description requirement can be met by: "showing that an invention is complete by disclosure of sufficiently detailed, relevant identifying characteristics . . . i.e., complete or partial structure, or other physical and/or chemical properties, functional characteristics when coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 296 F.3d 1316, 1324, 63 U.S.P.Q.2d 1609, 1613 (Fed. Cir. 2002)). In the context of satisfying the written description requirement for antibodies in particular, the Federal Circuit has recently stated that:

> based on our past precedent, as long as an applicant has disclosed a "fully characterized antigen," either by its structure, formula, chemical name, or physical properties, or by depositing the protein in a public depository, the applicant can then claim the antibody by its binding affinity to that described antigen.

*Noelle v. Lederman*, 355 F.3d 1343, 1349, 69 U.S.P.Q.2d 1508, 1514 (Fed. Cir. 2004).

**C.    *HGS's March 17, 1997 Priority Application Provides an Enabled Description of an Embodiment of Count 1 and of Proposed Count 2***

**1.    *Count 1***

Count 1 is represented, in one alternative, by claim 21 of HGS's '568 patent.  (Fact 9).

Claim 21 (re-written in independent form with all the limitations of claim 15 from which it depends) is as follows:

> An isolated monoclonal antibody or fragment thereof that specifically binds to a protein consisting of amino acid residues 1 to 133 of SEQ ID NO:2, wherein said antibody or fragment thereof is an antagonist of the protein of SEQ ID NO:2.

(Fact 10).

SEQ ID NO:2 is the amino acid sequence of the full-length DR5 protein.  (Fact 11).  Amino acid residues 1 to 133 of SEQ ID NO:2 represent the extracellular domain of DR5.  (Fact 12).  For simplicity, the count will be referred to herein as being directed to antagonistic antibodies or fragments thereof which specifically bind to the extracellular domain of DR5.

To be accorded benefit of the March 17, 1997 priority application, HGS need only show that the priority application enables and describes an antagonistic monoclonal antibody or fragment thereof that specifically binds to a protein consisting of the extracellular domain of DR5.  As explained below, the March 17, 1997 priority application provides a fully enabled description of antagonistic antibodies of count 1.

### (a)    *The Expert Opinion of Dr. John Reed*

Party Ni has asked Dr. John Reed to evaluate the descriptions of HGS's priority documents in order to provide his opinion as to what a person of ordinary skill in the art would have understood upon reading the documents at the time of their filing. Dr. Reed's Declaration is specifically referenced in various places throughout this Motion. Dr. Reed is a highly recognized expert in the field of apoptosis and cell death regulation. He is currently the President and Chief Executive Officer of the Burnham Institute where he is also the head of a research laboratory. (Fact 13). Dr. Reed has authored or co-authored over 600 publications and has received several awards and honors from the scientific community (*e.g.*, the Decade's Most Highly Cited Apoptosis Researcher from 1991-2001, and the #1 Hottest Researcher in Life Sciences Worldwide (2000 and 1999)). (Fact 14). Dr. Reed's credentials and credibility are beyond challenge.

### (b)    *Count 1 is Fully Enabled*

After reading HGS's March 17, 1997 priority application, a person of ordinary skill in the art would have been able to make and use, without undue experimentation, a monoclonal antibody that specifically binds to the extracellular domain of DR5 and that is an antagonist of DR5. As confirmed by Dr. Reed, to make and use an antibody of the count, one of ordinary skill in the art would typically: (1) produce monoclonal antibodies that specifically bind to the ECD of DR5; and (2) determine by routine screening whether the monoclonal antibodies are antagonists of DR5. (Fact 15). These two processes would not have involved undue experimentation at the time of filing.

> **(i)**    *The March 17, 1997 Priority Application Indicates that DR5 is a Novel Apoptosis-Inducing Death Receptor*

As confirmed by Dr. Reed, in view of HGS's March 17, 1997 application, including the disclosed similarity of DR5 to previously-known death receptors (TNFR1, Fas and DR3, each of which was known to induce apoptosis), and in view of the state of the art prior to March 17, 1997, the most reasonable conclusion to draw from HGS's March 17, 1997 application is that DR5 is expected, by persons of ordinary skill in the art, to be a novel death receptor. (Fact 16). Additionally, it is noted by Dr. Reed that, in view of HGS's March 17, 1997 application and the state of the art, a person of ordinary skill in the art would have predicted that activation of DR5 would induce apoptosis. (Fact 17). This conclusion is explicitly stated in Ni's March 17, 1997 application. (Fact 18). According to Dr. Reed, based on the information provided in HGS's March 17, 1997 application and what was known at the time, a person of ordinary skill in the art would have reasonably believed the assertion that activation of DR5 would induce apoptosis. (Fact 19).

> **(ii)**    *Expression and Purification of DR5 Polypeptides Would Not Have Required Undue Experimentation*

The March 17, 1997 priority application discloses the complete amino acid sequence of DR5, which is represented by SEQ ID NO:2. (Fact 20). The specification also identifies amino acid residues 52 to 184 as constituting the extracellular domain of DR5. (Fact 21). In HGS's subsequent applications, residues 52-184 are referred to as residues 1-133.[1] (Fact 23). The March

---

[1] Subsequent to the March 17, 1997 application, the amino acids in SEQ ID NO:2 were renumbered in the sequence listing so that the residues of the leader sequence were designated

17, 1997 priority application also describes a cDNA sequence encoding the amino acid sequence of SEQ ID NO:2. (Fact 24). Also, a clone containing a cDNA encoding SEQ ID NO:2 was deposited at the American Type Culture Collection. (Fact 25). As confirmed by the Declaration of Dr. Reed, the DR5 cDNA described in the March 17, 1997 priority application could have been used to express the extracellular domain of DR5 in various expression systems. (Fact 26).

The March 17, 1997 priority application also teaches exemplary antigenic polypeptides and peptides for use in generating DR5-specific antibodies, including a polypeptide comprising amino acid residues from about 62 to about 110, and a polypeptide comprising amino acid residues from about 119 to about 164.  (Fact 27).  Both of these exemplary antigenic polypeptides include sequences within the DR5 extracellular domain.  (Fact 28).

According to Dr. Reed, based on the description in HGS's March 17, 1997 application and knowledge in the art by March 17, 1997, expression of the extracellular domain of DR5 for the purposes of creating a purified protein for antibody production would have been routine to one of ordinary skill in the art.  (Fact 29).  In addition, Dr. Reed notes that, by using techniques that were routine by March 17, 1997, one of ordinary skill in the art could have purified the expressed DR5 polypeptide (or a fragment thereof) without undue experimentation.  (Fact 30).

---

-51 to -1, and the first residue of the extracellular domain was designated 1.  (Fact 22). Therefore, amino acid residues 52 to 184 of SEQ ID NO:2 in the March 17, 1997 application are the same as amino acid residues 1 to 133 in the later applications and the involved '568 patent. (Fact 23).  An illustration of the two numbering schemes is set forth in the attached Appendix D.

**Ni Substantive Motion 3**
**(To Change Benefit Accorded for the Contested Subject Matter)**
Patent Interference No. 105,240

(iii)    *A Person of Ordinary Skill in the Art Could Have Made*
*Monoclonal Antibodies that Specifically Bind the*
*Extracellular Domain of DR5*

With respect to making antibodies specific for DR5, the March 17, 1997 priority application states that:

> Antibodies according to the present invention may be prepared by any of a variety of methods using DR5 immunogens of the present invention. As indicated, such DR5 immunogens include the full length DR5 polypeptide (which may or may not include the leader sequence) and DR5 polypeptide fragments such as the ligand binding domain, the transmembrane domain, the intracellular domain and the death domain.

(Fact 31). As confirmed by Dr. Reed, techniques for producing monoclonal antibodies were well known in the art by March 17, 1997. (Fact 32). Dr. Reed notes that, in view of the March 17, 1997 priority application, persons of ordinary skill in the art could have, without undue experimentation, used such techniques to produce monoclonal antibodies that bind to the extracellular domain of DR5. (Fact 33). Although monoclonal antibody technology involves screening hybridomas to identify those that secrete the desired antibody, such screening at the time of the March 17, 1997 priority application was considered routine in the art, as confirmed almost a decade earlier by the court in *Wands*. 858 F.2d at 740, 8 U.S.P.Q.2d at 1406.

     *(iv)*     *A Person of Ordinary Skill in the Art Could Have Identified Antagonistic Antibodies Specific for the Extracellular Domain of DR5.*

After making monoclonal antibodies that specifically bind to the extracellular domain of DR5, a person of ordinary skill in the art could have, as of the March 17, 1997 priority date, determined whether the antibodies were antagonists of DR5. As confirmed by Dr. Reed, and discussed below, such a determination could have been made without undue experimentation. (Fact 34).

Antagonists are described in the March 17, 1997 priority application as "naturally occurring and synthetic compounds capable of inhibiting apoptosis." (Fact 35). Thus, as confirmed by Dr. Reed, a person of ordinary skill in the art would have simply needed to determine whether a particular monoclonal antibody that specifically binds to the extracellular domain of DR5 inhibited apoptosis. (Fact 36).

The March 17, 1997 priority application teaches an exemplary method for assaying for DR5-induced apoptosis and cites several scientific references that illustrate the general method. (Fact 37). As summarized in this example, cells in which apoptosis is induced by DR5 expression become rounded and condensed and detach from the culture dish, which can be observed experimentally.

According to the Declaration of Dr. Reed, as of the March 17, 1997 priority date, a person of ordinary skill in the art would have understood that the apoptosis assay of this Example could have been conducted in the presence and absence of a candidate antibody. (Fact 38). If

the addition of the antibody resulted in a decrease in the extent of apoptosis as compared to the extent of apoptosis observed in the control experiment lacking the antibody, then a skilled person would conclude that the antibody was an antagonist of DR5. (Fact 38). As confirmed by Dr. Reed, conducting such screening experiments as of the March 17, 1997 priority date would not have required undue experimentation. (Fact 39).

An analysis of the factors set forth in *In re Wands*, 858 F.2d at 737, 8 U.S.P.Q.2d at 1404, confirms the conclusion of Dr. Reed that making and using antibodies of the count would not have involved undue experimentation. First, the nature of the invention is antagonistic monoclonal antibodies. (Fact 6). The field of the invention was well-developed as of March 17, 1997. By March 17, 1997, others had demonstrated that antagonistic monoclonal antibodies could be made that bind to the death receptors Fas and TNFR1, which are highly similar to DR5. (Fact 44). Thus, the state of the prior art was sufficiently advanced. A person of ordinary skill in the art would have had knowledge of the scientific literature concerning TNFRs and at least a general familiarity with techniques involved in recombinant DNA, molecular biology and antibodies, including monoclonal antibodies. (Fact 40). A person of ordinary skill in the art would have had a Bachelor's degree or higher in the biological sciences. (Fact 40). Thus, the level of one of ordinary skill was high. Moreover, by March 17, 1997, others had made antagonistic monoclonal antibodies specific for death receptors (Fact 44), and there is no indication that making such antibodies involved anything more than the application of routine techniques and screening. Thus, the level of predictability in the art was high. The March 17, 1997 priority application, in view of the existing knowledge in the art, provides all of the

information necessary for one of ordinary skill in the art to make antagonistic monoclonal antibodies of the count, including, *inter alia*, the amino acid sequence of DR5, identification of the ECD, and sequence comparisons of DR5 to other death receptors. (Facts 20 and 21). Accordingly, the amount of direction provided by the March 17, 1997 priority application is substantial. In view of the substantial direction provided in the March 17, 1997 application, and the advanced state of the art, the absence of a working example in the application is immaterial. Finally, while making antibodies that fall within the scope of the count would have involved some screening, just like in *Wands,* persons of ordinary skill in the art would have been prepared to engage in such screening. Therefore, the quantity of experimentation needed to make the antibodies of the count, based on the March 17, 1997 application and the knowledge that existed in the art, would not have been undue.

In light of the foregoing considerations, balanced in view of what was known by March 17, 1997 and what is disclosed in HGS's March 17, 1997 priority application, screening for antagonistic antibodies that bind to the ECD of DR5 would not have required undue experimentation.

### (v)    The "How to Use" Prong of 35 U.S.C. § 112, First Paragraph is Also Clearly Satisfied

The enablement requirement of 35 U.S.C. § 112, first paragraph, also includes a 'how to use' prong. This prong is satisfied if a person of ordinary skill in the art would have reasonably believed the applicant's assertion of utility. Because the March 17, 1997 priority application

includes at least one believable asserted utility for the antibodies of the count, it is clear that the 'how to use' prong of 35 U.S.C. § 112, first paragraph is fully met for the count.

The specification describes therapeutic utilities for antagonistic antibodies against DR5. More specifically, the specification teaches that antagonistic monoclonal antibodies against DR5 polypeptide, are useful for treating diseases associated with increased apoptosis, including AIDS/HIV infection. (Fact 42). As confirmed by Dr. Reed, by March 17, 1997, persons of ordinary skill in the art reasonably expected that antagonists of death receptors, including antagonistic antibodies, could be used for treating various inflammatory diseases and HIV due to the well known role of TNF-family receptors in these diseases. (Fact 43). Thus, the above-noted therapeutic utilities set forth in the March 17, 1997 priority application would have been believable to persons of ordinary skill in the art.

In addition, as confirmed by Dr. Reed, monoclonal antibodies against TNFR1 and Fas, death receptors that share substantial sequence similarity with DR5, had been shown in the art to be antagonists of their respective receptors (*i.e.*, to inhibit the apoptotic signal induced by these receptors). (Fact 44). Thus, according to Dr. Reed, it would have been reasonable for one of ordinary skill in the art to believe that antagonistic antibodies that specifically bind to DR5 would suppress apoptosis in cells. (Fact 45). As confirmed by Dr. Reed, the above-mentioned therapeutic utilities of antagonistic antibodies against DR5 asserted in HGS's March 17, 1997 priority application would have been regarded as believable by persons of ordinary skill in the art in view of what was known of the value of therapeutic antagonistic antibodies that bind to

apoptosis-inducing molecules. (Fact 46). The March 17, 1997 priority application therefore satisfies the 'how to use' prong of 35 U.S.C. § 112, first paragraph.

A second utility asserted in the March 17, 1997 application for antibodies against DR5 relates to diagnostic applications. (Fact 47). For example, the specification describes the use of antibodies to DR5 in assays for detecting over-expression of DR5 compared to normal control tissue. (Fact 48). The Declaration of Dr. Reed confirms that the diagnostic utilities for DR5-specific antibodies asserted in the March 17, 1997 priority application would have been believable to one of ordinary skill in the art reading HGS's March 17, 1997 priority application. (Fact 49).

In summary, a person of ordinary skill in the art, in view of the March 17, 1997 specification and coupled with what was known in the art, could have made an isolated monoclonal antibody that specifically binds to the extracellular domain of DR5 and that is an antagonist of DR5, without undue experimentation. Additionally, at least one utility for such antibodies asserted in the March 17, 1997 specification would have been believable to one of ordinary skill in the art for the count. Accordingly, it is clear that the March 17, 1997 priority application fully enables the subject matter of Count 1.

> ### (vi)    *The USPTO Has Explicitly Acknowledged That the March 17, 1997 Priority Application Enables and Describes Antagonistic Antibodies Specific for The ECD of DR5*

Additionally, Party Ni respectfully reminds the Board that in the Notice of Allowability for the application that directly led to HGS's involved patent, the Examiner explicitly

acknowledged that the March 17, 1997 priority application enables and describes antagonistic antibodies specific for the ECD of DR5. (Fact 2). According to the Examiner:

> The structure of DR5 is shown in Fig. 1 of 60/040,846, with delineation of domains described in the Brief Description on page 5, lines 1-7, including the extracellular ligand-binding domain. It is also disclosed on page 32, lines 11-14, that DR5 agonists enhance apoptosis, and in Example 5 (pp. 43-44) that activation of DR5 is expected to result in induction of apoptosis. Therefore, with both the structure and the function of DR5 in hand, as well as a teaching of agonists and antagonists, which include antibodies (p. 29, lines 14-19 and p. 27, lines 16-17, respectively), the skilled artisan would have been able to make and use the instantly claimed agonist and antagonist antibody without undue experimentation and would have recognized the Inventors to be in possession of the claimed antibodies.

(Fact 2). Although the Board is not bound by the Examiner's statements, Party Ni respectfully urges the Board to consider the Examiner's position as further support for HGS's request to be accorded the benefit of the March 17, 1997 priority application.

**(c)      *HGS's March 17, 1997 Priority Application Fully Describes the Invention of Count 1***

As confirmed by the accompanying Declaration of John Reed, a person of ordinary skill in the art would recognize that the March 17, 1997 priority application fully describes the subject matter of Count 1.  (Fact 50).  As discussed below, the March 17, 1997 priority application provides adequate written description of antibodies that fall within the scope of count 1.

**(i)      *The Sequence of DR5 and Its Extracellular Domain Are Described***

The Federal Circuit has recently confirmed that disclosure of a fully characterized antigen will satisfy the written description requirement for antibodies specific to that antigen.  *Noelle*, 355 F.3d at 1349, 69 U.S.P.Q.2d at 1514.  The March 17, 1997 specification provides the complete sequence of DR5, including the portion of the sequence corresponding to the extracellular domain (amino acids 1-133), as recited in the count.  (Facts 20 and 21).  The March 17, 1997 priority application fully characterizes the extracellular domain of DR5 (*e.g.*, by disclosing the amino acid residues of the DR5 protein that correspond to the extracellular domain: residues 52 to 184 (which in subsequent applications were re-numbered as residues 1-133)).  Thus, under the *Noelle* analysis, the March 17, 1997 priority application adequately describes antibodies that specifically bind to the extracellular domain of DR5 by virtue of the identification and disclosure of the amino acid sequence of the DR5 extracellular domain.

The March 17, 1997 priority application also provides a detailed description of antigenic portions of DR5, which are "useful to raise antibodies, including monoclonal antibodies that bind specifically to a polypeptide of the invention."  (Fact 51).  The specification also provides

examples of such polypeptides that fall within the ECD, including "a polypeptide comprising amino acid residues from about 62 to about 110 in Figure 1 (SEQ ID NO:2); [and] a polypeptide comprising amino acid residues from about 119 to about 164 in Figure 1 (SEQ ID NO:2) . . . ." (Fact 27).

As further confirmation that HGS had full possession of antibodies to the extracellular domain of DR5, the specification states that "polypeptide fragments such as the ligand binding domain" can be used as immunogens. (Fact 52). The "ligand binding domain" is identified as being within residues from about 52 to about 184 of SEQ ID NO:2 (*i.e.*, within the extracellular domain). (Fact 53).

### (ii)    *Antagonistic Antibodies to the Extracellular Domain of DR5 are Described*

As noted by Dr. Reed, the March 17, 1997 priority application provides a clear description of antagonistic monoclonal antibodies that bind to the ECD of DR5. (Fact 54). By providing the amino acid sequence of the ECD of DR5, along with methods for producing and screening antagonistic antibodies, HGS's March 17, 1997 priority application clearly sets forth the invention. (Fact 55). In view of the level of detail set forth in HGS's March 17, 1997 priority application regarding antagonistic antibodies, a person of ordinary skill in the art could distinguish such antibodies from other antagonistic monoclonal antibodies. (Fact 56). Thus, as noted by Dr. Reed, HGS's March 17, 1997 priority application clearly conveys to a person of ordinary skill in the art that the inventors had described monoclonal antagonistic antibodies that

specifically bind to the ECD of DR5, and that the inventors recognized that they had described such antibodies. (Fact 57).

The level of disclosure needed to satisfy the written description requirement of 35 U.S.C. § 112, first paragraph, varies depending on the state of the art. *See Capon*, 418 F.3d at 1357, 76 U.S.P.Q.2d at 1084. According to Dr. Reed, the state of the art as it existed by March 17, 1997 included demonstrations by others that antagonistic antibodies could be made that bind to the death receptors Fas and TNFR1, which are highly similar to DR5. (Fact 58). In addition, as noted by Dr. Reed, monoclonal antibody technology was well-known to persons of ordinary skill in the art by March 17, 1997. (Fact 59). Thus, the state of the art relating to the production of monoclonal antibodies, including monoclonal antibodies against death receptors, was advanced and well developed by March 17, 1997. Accordingly, the disclosure set forth in the March 17, 1997 priority application is more than sufficient to describe the subject matter of count 1.

### 2.    *HGS's March 17, 1997 Priority Document Fully Describes and Enables Proposed Count 2*

HGS has filed concurrently herewith SUBSTANTIVE MOTION 4 TO SUBSTITUTE NEW COUNT 2, requesting that count 1 be replaced with proposed count 2. The proposed modified count is identical to count 1 except that the limitation to monoclonal antibodies has been removed.

HGS's March 17, 1997 priority application also provides an enabled description of an embodiment of proposed count 2. As explained above, HGS's March 17, 1997 priority application fully enables and describes isolated *monoclonal* antibodies that fall within the scope

of count 1. Such monoclonal antibodies necessarily fall within the scope of proposed count 2, which is slightly broader than the existing count.

In addition, the March 17, 1997 priority application enables and describes antagonistic antibodies generally, and polyclonal antibodies in particular, wherein the antibodies specifically bind the extracellular domain of DR5. For example, the March 17, 1997 priority application states that "[a]ntigenic epitope-bearing peptides and polypeptides of the invention are therefore useful to *raise antibodies, including monoclonal antibodies*, that bind specifically to a polypeptide of the invention." (Fact 60). This passage clearly describes all types of antibodies for use with the invention. As confirmed by Dr. Reed, the March 17, 1997 application provides a clear description of polyclonal antibodies that bind to the ECD of DR5. (Fact 61).

Thus, HGS's March 17, 1997 priority application fully enables and describes antagonistic antibodies that specifically bind to the extracellular domain of DR5, including monoclonal and polyclonal antibodies. Therefore, HGS's March 17, 1997 priority application fully enables and describes embodiments of proposed count 2 for at least the same reasons that the application fully enables and describes embodiments of count 1.

D.     ***HGS's July 29, 1997 Priority Application Provides an Enabled Description of an Embodiment of Count 1 and of Proposed Count 2***

1.     ***Count 1***

HGS's July 29, 1997 priority application contains all of the disclosure found in HGS's March 17, 1997 application. (Fact 62). Therefore, the July 29, 1997 application would have

fully enabled the invention of count 1 for at least the same reasons that the March 17, 1997 application would have fully enabled the invention of count 1.

In addition, as confirmed by Dr. Reed, HGS's July 29, 1997 application supplements the disclosure in Ni's March 17, 1997 application and also contains data that confirm various assertions made in the March 17, 1997 application. (Fact 63). For example, as acknowledged by Dr. Reed, the July 29, 1997 application provides a working example (Example 5) confirming that overexpression of DR5 in mammalian cells induces apoptosis. (Fact 64). Such an apoptosis assay, including the expected results, was prophetically described in Example 5 of the March 17, 1997 priority application. (Fact 65). Accordingly, the July 29, 1997 priority application provides more than an adequate written description of the subject matter of the count.

HGS's July 29, 1997 priority application also provides a working example (Example 6) that confirms that the extracellular domain of DR5 binds the cytotoxic ligand TRAIL and blocks TRAIL-induced apoptosis. (Fact 66). Also, a DR5-Fc fusion construct was shown to inhibit TRAIL-induced apoptosis. (Fact 66).

As indicated by Dr. Reed, the results presented in the July 29, 1997 priority application confirm the teachings from HGS's March 17, 1997 application which identified DR5 as an apoptosis-inducing death receptor. (Fact 67). As confirmed by Dr. Reed, HGS's July 29, 1997 priority application provides further support for the asserted uses of antagonistic antibodies that bind to the extracellular domain of DR5 as agents that inhibit DR5-mediated apoptosis. (Fact 68).

As noted above, the July 29, 1997 application contains all of the disclosure that is found in HGS's March 17, 1997 priority application. (Fact 62). Thus, the July 29, 1997 application fully describes the invention of count 1 for at least the same reasons that HGS's March 17, 1997 priority application fully describes the invention of count 1. In addition, as confirmed by Dr. Reed, the working examples in the July 29, 1997 application provide further confirmation that the applicants adequately described an embodiment of count 1. (Facts 67 and 68).

### 2. Proposed Count 2

As with the March 17, 1997 priority application, HGS's July 29, 1997 priority application also provides an enabled description of an embodiment of proposed count 2. As explained above, HGS's March 17 and July 29, 1997 priority applications fully enable and describe isolated antagonistic antibodies that specifically bind to the extracellular domain of DR5, including monoclonal and polyclonal antibodies. Such antibodies necessarily fall within the scope of proposed count 2. Therefore, HGS's July 29, 1997 priority application fully enables and describes embodiments of proposed count 2 for at least the same reasons that the March 17 and July 29, 1997 priority applications fully enable and describe embodiments of count 1.

### E. HGS's Later Filed Priority Applications Provide an Enabled Description of an Embodiment of Count 1 and of Proposed Count 2

HGS's later filed priority applications (09/042,583, filed March 17, 1998; 60/132,498, filed May 4, 1999; 60/133,238, filed May 7, 1999; and 60/148,939, filed August 13, 1999) contain at least the same disclosure as is found in the March 17 and July 29, 1997 priority applications. Moreover, nothing in the later filed priority applications provides any basis for

doubting the assertions of the March 17, 1997 and July 29, 1997 priority applications. Thus, for at least the same reasons that the March 17 and July 29, 1997 priority applications enable and describe embodiments of count 1 and of proposed count 2, it follows that the later filed priority applications also enable and describe embodiments of count 1 and of proposed count 2.

## V.    *Summary and Conclusion*

HGS has not been accorded benefit of any of its priority applications. As demonstrated above and confirmed by Dr. Reed, Party Ni's priority applications fully describe and enable at least one embodiment of the existing count and of the proposed count. Accordingly, HGS should be accorded the benefit of all of its priority applications (*see* Exhibit C), including, *inter alia*, the March 17, 1997 priority application and the July 29, 1997 priority application.

As discussed above, HGS's March 17, 1997 priority application would have enabled one of ordinary skill in the art to make and use, without undue experimentation, isolated monoclonal antibodies that specifically bind to a protein consisting of the extracellular domain of DR5 and that are antagonists of DR5. *Wands*, 858 F.2d at 740, 8 U.S.P.Q.2d at 1406. Furthermore, the March 17, 1997 priority application provides more than an adequate description of such antibodies and of the DR5 extracellular domain to which the antibodies specifically bind. *Noelle*, 355 F.3d at 1349, 69 U.S.P.Q.2d at 1514. Therefore, the March 17, 1997 priority application is a constructive reduction to practice of the invention of count 1 and of proposed count 2. Indeed, in the Notice of Allowability for the application that directly led to HGS's involved patent, the Examiner explicitly acknowledged that the March 17, 1997 priority application enables and describes antagonistic antibodies specific for the ECD of DR5. It follows

that the July 29, 1997 application, which provides working examples confirming that DR5 is an apoptosis-inducing, TRAIL-binding receptor, is also a constructive reduction to practice. It also necessarily follows that the March 17, 1998; May 4, 1999; May 7, 1999; and August 13, 1999 priority applications, which contain at least the same disclosure as is found in the March 17, 1997 and July 29, 1997 priority applications, are also constructive reductions to practice.

For at least the foregoing reasons, the Board should accord HGS benefit of its priority applications.

Respectfully submitted,

Jorge A. Goldstein
Attorney for Party Ni
Registration No. 29,021

Date: December 7, 2005
Sterne, Kessler, Goldstein & Fox P.L.L.C.
1100 New York Avenue, NW
Washington, D.C. 20005-3934

472655_2.DOC

## CERTIFICATE OF SERVICE

I, Jorge A. Goldstein, hereby certify that a copy of the foregoing NI SUBSTANTIVE MOTION 3 (To Change Benefit Accorded for the Contested Subject Matter), filed December 7, 2005, has been served on the attorney of record of Party Rauch via Federal Express on this 7th day of December 2005, addressed as follows:

Michael J. Wise
Perkins Coie LLP
1620 26th Street
6th Floor, South Tower
Santa Monica, CA 90404-4013
Tel: 310-788-3210
Fax: 310-788-3399

Respectfully submitted,

_____
Jorge A. Goldstein
Attorney for Party Ni
Registration No. 29,021

Date: ___December 7, 2005_____
Sterne, Kessler, Goldstein & Fox P.L.L.C.
1100 New York Avenue, NW
Washington, D.C. 20005-3934

- 26 -                                    **Ni Substantive Motion 3**
**(To Change Benefit Accorded for the Contested Subject Matter)**
Patent Interference No. 105,240

## APPENDIX A TO NI SUBSTANTIVE MOTION 3
**(To Change Benefit Accorded for the Contested Subject Matter)**

### Evidence Relied on in the Motion

| Ni Exhibit # | NX # | Description |
|---|---|---|
| **Exhibit 2004** | **NX 2004** | U.S. Patent No. 6,872,568 |
| **Exhibit 2024** | **NX 2024** | Ni U.S. Application No. 09/042,583 (March 17, 1998 priority application) |
| **Exhibit 2026** | **NX 2026** | Yagita *et al.*, *Cancer Sci.* 95:777-783 (2004) "TRAIL and its receptors as targets for cancer therapy" |
| **Exhibit 2031** | **NX 2031** | Pan *et al.*, *Science* 277:815-818 (August 8, 1997) "An Antagonist Decoy Receptor and a Death Domain-Containing Receptor for TRAIL" |
| **Exhibit 2042** | **NX 2042** | Ni U.S. Appl. No. 60/040,846 (March 17, 1997 priority application) |
| **Exhibit 2045** | **NX 2045** | Espevik T. *et al. J. Exp. Med.* 171: 415 (1990) |
| **Exhibit 2046** | **NX 2046** | Sheehan, K.C.F. *et al. J. Exp. Med.* 181: 607 (1995) |
| **Exhibit 2053** | **NX 2053** | Notice of Allowability for U.S. Application No. 09/565,009, mailed January 21, 2005 |
| **Exhibit 2056** | **NX 2056** | Ni U.S. Appl. No. 60/054,021 (July 29, 1997 priority application) |
| **Exhibit 2057** | **NX 2057** | Declaration of John C. Reed, M.D., Ph.D. |
| **Exhibit 2058** | **NX 2058** | Chinnaiyan et al., *Science* 274:990-992 (1996) |
| **Exhibit 2059** | **NX 2059** | Marsters et al., *Current Biology* 6:1669-1676 (1996) |
| **Exhibit 2060** | **NX 2060** | Bodmer et al., *Immunity* 6:79-88 (1997) |
| **Exhibit 2061** | **NX 2061** | *Curriculum vitae* for Dr. John Reed |
| **Exhibit 2062** | **NX 2062** | Tartaglia and Goeddel, *J. of Biol. Chem.* 267: 4304-4307 (1992) |
| **Exhibit 2063** | **NX 2063** | Ni U.S. Appl. No. 60/132,498; (May 4, 1999 priority application) |
| **Exhibit 2064** | **NX 2064** | Ni U.S. Appl. No. 60/133,238 (May 7, 1999 priority application) |
| **Exhibit 2065** | **NX 2065** | Ni U.S. Appl. No. 60/148,939 (August 13, 1999 priority application) |
| **Exhibit 2066** | **NX 2066** | Locksley, RM, et al. *Cell* 104: 487, (2001) |
| **Exhibit 2067** | **NX 2067** | Tartaglia, LA *et al. Cell* 74: 845 (1993) |
| **Exhibit 2068** | **NX 2068** | Wallach, D. *et al. TIBS* 20: 342 (1995) |
| **Exhibit 2069** | **NX 2069** | Itoh *et al. J. Biol. Chem.* 268: 10932 (1993) |

Ni Substantive Motion 3
(To Change Benefit Accorded for the Contested Subject Matter)
Patent Interference No. 105,240

| Ni Exhibit # | NX # | Description |
|---|---|---|
| Exhibit 2070 | NX 2070 | Boldin, M.P. *et al. J Biol Chem* 270: 387 (1995) |
| Exhibit 2071 | NX 2071 | Kitson, J, *et al. Nature* 384: 372, (1996) |
| Exhibit 2072 | NX 2072 | Brutlag et al. *Comp. Appl. Biosci.* 6:237-245 (1990) |
| Exhibit 2073 | NX 2073 | Altschul et al., *J Mol Biol.* 215(3):403-10 (1990) |
| Exhibit 2074 | NX 2074 | Clewley et al., *Methods Mol Biol.* 70:119-29 (1997) |
| Exhibit 2075 | NX 2075 | Higgins et al., *Gene* 73(1):237-44 (1988) |
| Exhibit 2076 | NX 2076 | Devereux et al., *Nucleic Acids Res.* 12(1 Pt 1):387-95 (1984) |
| Exhibit 2077 | NX 2077 | Nakai and Kanehisa, *Genomics* 14:897-911, 1992 |
| Exhibit 2078 | NX 2078 | Itoh, N. et al. Cell 66: 233 (1991) |
| Exhibit 2079 | NX 2079 | Yonehara, S *et al. J. Exp. Med.* 169: 1747 (1989) |
| Exhibit 2080 | NX 2080 | Trauth, B.C. *et al. Science* 245: 301 (1989) |
| Exhibit 2081 | NX 2081 | Cifone, MG *et al. J. Exp. Med.* 177: 1547 (1993) |
| Exhibit 2082 | NX 2082 | Tartaglia, L.A. *et al. Proc. Natl. Acad. Sci.* 88: 9292 (1991) |
| Exhibit 2083 | NX 2083 | Kohler and Milstein, *Nature* 256(5517):495-497 (1975) |
| Exhibit 2084 | NX 2084 | Ware et al., *J. Cell Biochem.* 60:47-55 (1996) |
| Exhibit 2085 | NX 2085 | Engelmann, H. *et al. J. Biol. Chem.* 265: 14497 (1990) |
| Exhibit 2086 | NX 2086 | Ware et al., *The Cytokine Handbook, Chapter 20*, pgs. 549-550 |
| Exhibit 2087 | NX 2087 | Fadeel, B. *et al. International Immunol.* 9: 201 (1997) |
| Exhibit 2088 | NX 2088 | Alderson, M.R. *et al. International Immunol.* 6: 1799 (1994) |
| Exhibit 2089 | NX 2089 | Maini et al., *Clin. Exp. Rheumatol.* 12 Suppl 11:S63-6 (1994) |
| Exhibit 2090 | NX 2090 | Feldmann et al., *Cir Shock* 43:179-84 (1994) |
| Exhibit 2091 | NX 2091 | Ni  File History for U.S. Appl. No. 09/042,583; (March 17, 1998 priority application) |

## APPENDIX B TO NI SUBSTANTIVE MOTION 3
### (To Change Benefit Accorded for the Contested Subject Matter)

### Statement of Material Facts

1. HGS's involved patent claims the benefit of six priority applications as outlined in Appendix C hereto. (Exhibit 2004, column 1, lines 6-17).

2. In the Notice of Allowability for the application that resulted in HGS's involved patent, the Examiner explicitly acknowledged that HGS's March 17, 1997 priority application (No. 60/040,846) enables and describes antagonistic antibodies specific for DR5 that are the subject of the count of this interference. (Exhibit 2053, page 2). The Examiner stated in the Notice of Allowability that:

> The structure of DR5 is shown in Fig. 1 of 60/040,846, with delineation of domains described in the Brief Description on page 5, lines 1-7, including the extracellular ligand-binding domain. It is also disclosed on page 32, lines 11-14, that DR5 agonists enhance apoptosis, and in Example 5 (pp. 43-44) that activation of DR5 is expected to result in induction of apoptosis. Therefore, with both the structure and the function of DR5 in hand, as well as a teaching of agonists and antagonists, which include antibodies (p. 29, lines 14-19 and p. 27, lines 16-17, respectively), the skilled artisan would have been able to make and use the instantly claimed agonist and antagonist antibody without undue experimentation

and would have recognized the Inventors to be in possession of the

claimed antibodies.

(Exhibit 2053, page 2).

3.  HGS has not been accorded the benefit of any of its priority applications in this

    interference.  (Declaration of Interference No. 105,240, dated August 31, 2005, page

    2).

4.  The amino acid sequence of DR5 is set forth in HGS's involved patent as SEQ ID

    NO: 2.  (Exhibit 2004, columns 141-143).

5.  DR5 is a death domain-containing member of the tumor necrosis factor receptor

    (TNFR) superfamily (a "death receptor") and is involved in the induction of apoptosis

    in cells.  (Exhibit 2026, page 777).

6.  The antibodies of the count are specified as being antagonists of the DR5 protein.

    (Declaration of Interference No. 105,240, dated August 31, 2005, page 3;  Exhibit

    2004, column 159, lines 14-16, and 36-38).

7.  HGS's July 29, 1997 priority application provides a working example indicating that

    DR5 induces apoptosis.   (Exhibit 2056, page 48, line 17, through page 50, line 5;

    Exhibit  2057, paragraph 55).

8. HGS's July 29, 1997 priority application provides a working example indicating that the extracellular domain of DR5 interacts with the apoptosis-inducing ligand TRAIL. (Exhibit 2056, page 50, line 7, through page 51 line 2; Exhibit 2057, paragraph 56).

9. Count 1 is represented, in one alternative, by claim 21 of HGS's '568 patent. (Declaration of Interference No. 105,240, dated August 31, 2005, page 3).

10. Claim 21 of HGS's involved patent (re-written in independent form with all the limitations of claim 15 from which it depends) is as follows:

> An isolated monoclonal antibody or fragment thereof that specifically binds to a protein consisting of amino acid residues 1 to 133 of SEQ ID NO:2, wherein said antibody or fragment thereof is an antagonist of the protein of SEQ ID NO:2.

(Exhibit 2004, column 159, lines 14-16 and 36-38).

11. HGS's SEQ ID NO:2 is the amino acid sequence of the full-length DR5 protein. (Exhibit 2004, column 4, lines 53-54).

12. Amino acid residues 1 to 133 of HGS's SEQ ID NO:2 represent the extracellular domain of DR5. (Exhibit 2004, column 4, lines 57-60).

13. Dr. John Reed is currently the President and Chief Executive Officer of the Burnham Institute where he is also the head of a research laboratory. (Exhibit 2057, paragraphs 6 and 8).

**Ni Substantive Motion 3**
**(To Change Benefit Accorded for the Contested Subject Matter)**
Patent Interference No. 105,240

14. Dr. Reed has authored or co-authored over 600 publications and has received several awards and honors from the scientific community including the Decade's Most Highly Cited Apoptosis Researcher from 1991-2001 and the #1 Hottest Researcher in Life Sciences Worldwide (2000 and 1999). (Exhibit 2057, paragraphs 10 and 11).

15. According to the Declaration of Dr. John Reed, to make and use an antibody that is an antagonist of DR5, one of ordinary skill in the art would typically: (1) produce monoclonal antibodies that specifically bind to the ECD of DR5; and (2) determine by routine screening whether the monoclonal antibodies are agonists or antagonists of DR5. (Exhibit 2057, paragraph 33).

16. The Declaration of Dr. John Reed indicates that, in view of HGS's March 17, 1997 application, including the disclosed similarity of DR5 to previously-known death receptors (TNFR1, Fas and DR3, each of which was known to induce apoptosis), and in view of the state of the art prior to March 17, 1997, the most reasonable conclusion to draw from HGS's March 17, 1997 application is that DR5 is expected, by persons of ordinary skill in the art, to be a novel death receptor. (Exhibit 2057, paragraph 32).

17. The Declaration of Dr. John Reed indicates that, in view of HGS's March 17, 1997 application and the state of the art, a person of ordinary skill in the art would have predicted that activation of DR5 would induce apoptosis. (Exhibit 2057, paragraph 32).

18. The conclusion that activation of DR5 would induce apoptosis is explicitly stated in Ni's March 17, 1997 application.  (Exhibit 2042, page 6, lines 25-33; Exhibit 2057, paragraph 32).

19. The Declaration of Dr. John Reed indicates that, based on the information provided in HGS's March 17, 1997 application and what was known at the time, a person of ordinary skill in the art would have reasonably believed the assertion that activation of DR5 would induce apoptosis.  (Exhibit 2057, paragraph 32).

20. HGS's March 17, 1997 priority application discloses the complete amino acid sequence of DR5, which is represented by SEQ ID NO:2, and shows a comparison of the amino acid sequence of DR5 to other death receptors.  (Exhibit 2042, page 5, lines 19-21, and Figures 1 and 2).

21. HGS's March 17, 1997 priority application identifies amino acid residues 52 to 184 of SEQ ID NO:2 as constituting the extracellular domain of DR5.  (Exhibit 2042, page 5, lines 4-5, and Figure 1).

22. Subsequent to the filing of HGS's March 17, 1997 application, the amino acids in SEQ ID NO:2 were renumbered in the sequence listing so that the residues of the leader sequence were designated -51 to -1, and the first residue of the extracellular domain was designated 1.  (Exhibit 2004, columns 141 through 143).

23. Residues 52-184 of SEQ ID NO:2 in HGS's March 17, 1997 priority application are the same as residues 1-133 referred to in HGS's involved patent, as shown in Appendix D hereto. (Exhibit 2042, page 5, lines 3-5, Figure 1).

24. HGS's March 17, 1997 priority application describes a cDNA sequence encoding the amino acid sequence of SEQ ID NO:2. (Exhibit 2042, page 5, lines 24-29, Figure 1).

25. A clone containing a cDNA encoding SEQ ID NO:2 was deposited at the American Type Culture Collection. (Exhibit 2042, page 3, lines 22-25, Figure 1).

26. The Declaration of Dr. John Reed indicates that the DR5 cDNA described in HGS's March 17, 1997 priority application could have been employed to express the extracellular domain of DR5 in bacterial, yeast, insect and mammalian expression systems. (Exhibit 2057, paragraphs 36 and 41).

27. It is noted in HGS's March 17, 1997 priority application that "[n]on-limiting examples of antigenic polypeptides or peptides that can be used to generate DR5-specific antibodies include: a polypeptide comprising amino acid residues from about 62 to about 110 in Figure 1 (SEQ ID NO:2); a polypeptide comprising amino acid residues from about 119 to about 164 in Figure 1 (SEQ ID NO:2) . . . ." (Exhibit 2042, page 24, lines 24-28).

28. The exemplary antigenic polypeptides of HGS's March 17, 1997 priority application, comprising amino acid residues from about 62 to about 110, and from about 119 to

about 164, include sequences within the DR5 extracellular domain.  (Exhibit 2042, page 24, lines 24-28).

29. The Declaration of Dr. John Reed indicates that, based on the description in HGS's March 17, 1997 application and knowledge in the art by March 17, 1997, expression of the extracellular domain of DR5 for the purposes of creating a purified protein for antibody production would have been routine to one of ordinary skill in the art. (Exhibit 2057, paragraph 37).

30. The Declaration of Dr. John Reed indicates that, by using techniques that were routine by March 17, 1997, one of ordinary skill in the art could have purified the expressed DR5 polypeptide (or a fragment thereof) without undue experimentation. (Exhibit 2057, paragraph 38).

31. The March 17, 1997 priority application states that:

> Antibodies according to the present invention may be prepared by any of a variety of methods using DR5 immunogens of the present invention.  As indicated, such DR5 immunogens include the full length DR5 polypeptide (which may or may not include the leader sequence) and DR5 polypeptide fragments such as the ligand binding domain, the transmembrane domain, the intracellular domain and the death domain.

(Exhibit 2042, page 30, lines 26-31).

32. It is stated in the Declaration of Dr. John Reed that techniques for producing monoclonal antibodies were well known in the art by March 17, 1997. (Exhibit 2057, paragraph 40).

33. The Declaration of Dr. John Reed notes that, in view of the March 17, 1997 priority application, persons of ordinary skill in the art could have, without undue experimentation, used techniques that were known in the art to produce monoclonal antibodies that bind to the extracellular domain of DR5. (Exhibit 2057, paragraph 40).

34. The Declaration of Dr. John Reed states that it would not have required undue experimentation for a person of ordinary skill in the art to screen for antagonistic antibodies that bind to the ECD of DR5. (Exhibit 2057, paragraph 45).

35. Antagonists are described in HGS's March 17, 1997 priority application as "naturally occurring and synthetic compounds capable of inhibiting apoptosis." (Exhibit 2042, page 27, lines 19-20).

36. It is stated in the Declaration of Dr. John Reed that a person of ordinary skill in the art, to identify antagonistic antibodies that specifically bind to the ECD of DR5, would have needed to determine whether a particular monoclonal antibody that specifically binds to the extracellular domain of DR5 inhibited apoptosis. (Exhibit 2057, paragraph 42).

37. The March 17, 1997 priority application refers to an exemplary method (Example 5) for assaying for DR5-induced apoptosis and cites several scientific references that illustrate the general method. (Exhibit 2042, page 43, line 11, through page 44, line 4).

38. It is stated in the Declaration of Dr. John Reed that, as of the March 17, 1997 priority date, a person of ordinary skill in the art would have understood that the apoptosis assay of Example 5 of the March 17, 1997 priority application (Exhibit 2042, page 43, line 11, through page 44, line 4) could have been conducted in the presence and absence of a candidate antibody, and that if the addition of the antibody resulted in a decrease in the extent of apoptosis as compared to the extent of apoptosis observed in the control experiment lacking the antibody, then a person of ordinary skill in the art would have characterized the antibody as an antagonist of DR5. (Exhibit 2057, paragraph 43).

39. It is stated in the Declaration of Dr. John Reed that conducting screening experiments to determine if an antibody is an antagonist of DR5, as of the March 17, 1997 priority date, would not have required undue experimentation. (Exhibit 2057, paragraph 43).

40. The Declaration of Dr. John Reed sets forth the following assertions regarding "undue experimentation" factors, as they apply to the invention of Count 1: (A) *Nature of the Invention*: The nature of the invention is monoclonal antibodies; monoclonal antibody technology was well-known to persons of ordinary skill in the art by March 17, 1997;

(B) *State of the Prior Art*: By March 17, 1997, others had demonstrated that antagonistic antibodies could be made that bind to the death receptors Fas and TNFR1, which are proteins that are highly similar to DR5; (C) *Level of One of Ordinary Skill*: The level of one of ordinary skill is high; a person of ordinary skill would have had a knowledge of the scientific literature concerning TNFRs, and more particularly the death receptors and their ligands; a person of ordinary skill would preferably have  a Bachelor's degree or higher in the biological sciences and would have a general familiarity with techniques involved in recombinant DNA, molecular biology, and monoclonal antibodies; (D) *Level of Predictability in the Art*: the level of predictability in the art is high since one would have had a substantial degree of confidence in being able to produce antagonistic antibodies that bind to a death receptor such as DR5; (E) *Amount of Direction Provided By the March 17, 1997 Priority Application*: The level of direction in the March 17, 1997 priority application is substantial since the application discloses the complete nucleotide and deduced amino acid sequences of DR5 and it indicates the location of the ECD and death domain of DR5, and also discloses the similarity of DR5 to other death receptors; (F) *Working Examples*: Although the March 17, 1997 priority application does not exemplify experiments that were actually carried out on antagonistic antibodies, the absence of such examples would not prevent persons of ordinary skill in the art from obtaining and using such antibodies; and (G) *Quantity of Experimentation*: Although a person of ordinary skill in the art would need to screen a number of antibodies to identify antagonistic monoclonal antibodies that bind to the ECD of DR5, such

screening would have been routine for a person of ordinary skill in the art by March 17, 1997; additionally, persons of ordinary skill in the art would have been prepared to screen a considerable number of antibodies to identify antagonistic monoclonal antibodies that bind to the ECD of DR5, and such a person would have been able to distinguish such antagonistic antibodies from other antibodies.    (Exhibit 2057, paragraph 35(a)-(g), emphasis added).

41. It is noted in the Declaration of Dr. John Reed that, based on what was known by March 17, 1997 and what is disclosed in HGS's March 17, 1997 priority application, screening for antagonistic antibodies that bind to the ECD of DR5 would not have required undue experimentation.  (Exhibit 2057, paragraph 45).

42. HGS's March 17, 1997 priority application indicates that DR5 antagonists, including antagonistic monoclonal antibodies against DR5 polypeptide, are useful for treating diseases associated with increased apoptosis, such as AIDS/HIV infection.  (Exhibit 2042, page 26, line 34, though page 27, line 2; page 27, lines 11-17; page 31, lines 10-36).

43. It is noted in the Declaration of Dr. John Reed that, by March 17, 1997, persons of ordinary skill in the art reasonably expected that antagonists of death receptors, including antagonistic antibodies, could be used for treating various inflammatory diseases and HIV due to the well known role of TNF-family receptors in these diseases. (Exhibit 2057, paragraph 23 and 51).

44. It is noted in the Declaration of Dr. John Reed that monoclonal antibodies against TNFR1 and Fas, death receptors that share substantial sequence similarity with DR5, had been shown in the art to be antagonists of their respective receptors (*i.e.*, to induce or inhibit, respectively, the apoptotic signal induced by these receptors). (Exhibit 2057, paragraphs 35(b) and 49).

45. It is noted in the Declaration of Dr. John Reed that it would have been reasonable for one of ordinary skill in the art to believe that antagonistic antibodies that specifically bind to DR5 would suppress apoptosis. (Exhibit 2057, paragraph 50).

46. It is noted in the Declaration of Dr. John Reed that the therapeutic use of antagonistic antibodies for treating inflammatory diseases, such as rheumatoid arthritis, and HIV, would have been believable to one of ordinary skill in the art reading HGS's March 17, 1997 priority application in view of what was known of the value of therapeutic antagonistic antibodies that bind to apoptosis-inducing molecules. (Exhibit 2057, paragraph 51).

47. HGS's March 17, 1997 application discloses diagnostic uses for antibodies against DR5. (Exhibit 2042, page 25, line 16, through page 26, line 2).

48. HGS's March 17, 1997 priority application refers to a diagnostic assay for detecting over-expression of DR5 compared to normal control tissue. (Exhibit 2042, page 25, lines 20-22).

49. It is noted in the Declaration of Dr. John Reed that HGS's March 17, 1997 priority application describes diagnostic uses for antibodies to DR5, and that such uses would have been believable to one of ordinary skill in the art reading HGS's March 17, 1997 priority application. (Exhibit 2057, paragraph 52).

50. It is noted in the Declaration of John Reed that HGS's March 17, 1997 application provides a clear description of antagonistic monoclonal antibodies that bind to the ECD of DR5. (Exhibit 2057, paragraph 48).

51. It is noted in HGS's March 17, 1997 priority application that "[a]ntigenic epitope-bearing peptides and polypeptides of the invention are therefore useful to raise antibodies, including monoclonal antibodies that bind specifically to a polypeptide of the invention" and discloses exemplary antigenic polypeptides (Exhibit 2042, page 24, lines 16-32).

52. It is noted in HGS's March 17, 1997 priority application that "polypeptide fragments such as the ligand binding domain" can be used as immunogens. (Exhibit 2042, page 30, lines 26-31).

53. The "ligand binding domain" is identified in HGS's March 17, 1997 priority application as being within residues from about 52 to about 184 of SEQ ID NO:2 (*i.e.*, within the extracellular domain). (Exhibit 2042, page 23, lines 20-22).

**Ni Substantive Motion 3**
**(To Change Benefit Accorded for the Contested Subject Matter)**
Patent Interference No. 105,240

54. It is noted in the Declaration of Dr. John Reed that the March 17, 1997 priority application provides a clear description of antagonistic monoclonal antibodies that bind to the ECD of DR5. (Exhibit 2057, paragraph 48).

55. It is noted in the Declaration of Dr. John Reed that, by providing the amino acid sequence of the ECD of DR5, along with methods for producing and screening antagonistic antibodies, HGS's March 17, 1997 priority application clearly sets forth the invention. (Exhibit 2057, paragraph 48).

56. It is noted in the Declaration of Dr. John Reed that, in view of the level of detail set forth in HGS's March 17, 1997 priority application regarding antagonistic antibodies, a person of ordinary skill in the art could distinguish such antibodies from other antagonistic monoclonal antibodies. (Exhibit 2057, paragraph 48).

57. It is noted in the Declaration of Dr. John Reed that HGS's March 17, 1997 priority application clearly conveys to a person of ordinary skill in the art that the inventors had described monoclonal antagonistic antibodies that specifically bind to the ECD of DR5, and that the inventors recognized that they had described such antibodies. (Exhibit 2057, paragraph 48).

58. It is stated in the Declaration of Dr. John Reed that the state of the art as it existed by March 17, 1997 included demonstrations by others that antagonistic antibodies could be made that bind to TNFR family members Fas and TNFR1, which are highly similar to DR5. (Exhibit 2057, paragraph 35b).

59. It is stated in the Declaration of Dr. John Reed that monoclonal antibody technology was well-known to persons of ordinary skill in the art by March 17, 1997. (Exhibit 2057, paragraphs 35a and 40).

60. It is noted in HGS's March 17, 1997 priority application that "[a]ntigenic epitope-bearing peptides and polypeptides of the invention are therefore useful to raise antibodies, including monoclonal antibodies, that bind specifically to a polypeptide of the invention." (Exhibit 2042, page 24, lines 16-18).

61. It is stated in the Declaration of Dr. John Reed that the March 17, 1997 application provides a clear description of polyclonal antibodies that bind to the ECD of DR5. (Exhibit 2057, paragraph 48).

62. HGS's July 29, 1997 priority application (No. 60/054,021 (Exhibit 2056)) contains all of the disclosure found in HGS's March 17, 1997 application (No. 60/040,846). (Exhibit 2042).

63. It is stated in the Declaration of Dr. John Reed that HGS's July 29, 1997 application supplements the disclosure in HGS's March 17, 1997 application and also contains data that confirm various assertions made in the March 17, 1997 application. (Exhibit 2057, paragraph 54).

64. HGS's July 29, 1997 application provides a working example (Example 5) showing that overexpression of DR5 in mammalian cells induces apoptosis. The specification,

including Figures 5A and 5B, shows that overexpression of DR5 induced apoptosis in

MCF7 and HeLa cells to a similar extent as overexpression of TNFR1. (Exhibit

2057, paragraph 54; Exhibit 2056, page 48, line 17, through page 50, line 5).

65. Example 5 of HGS's July 29, 1997 priority application was prophetically described in

Example 5 of HGS's March 17, 1997 priority application. (Exhibit 2056, page 43,

line 10, through page 44, line 4).

66. HGS's July 29, 1997 priority application provides a working example (Example 6)

that shows that the extracellular domain of DR5 binds the cytotoxic ligand TRAIL

and blocks TRAIL-induced apoptosis, and that a DR5-Fc fusion construct inhibited

TRAIL-induced apoptosis. (Exhibit 2057, paragraph 54; Exhibit 2056, page 50, lines

7-38, and Figure 6B).

67. It is noted in the Declaration of Dr. John Reed that the results presented in HGS's July

29, 1997 priority application confirm the assertions from HGS's March 17, 1997

application which identified DR5 as a death receptor. (Exhibit 2057, paragraphs 54

and 55).

68. It is noted in the Declaration of Dr. John Reed that HGS's July 29, 1997 priority

application provides further support for the asserted uses of antagonistic antibodies

that bind to the extracellular domain of DR5 as agents that either induce or inhibit

DR5-mediated apoptosis. (Exhibit 2057, paragraph 56).

- 44 -                    Ni Substantive Motion 3
(To Change Benefit Accorded for the Contested Subject Matter)
Patent Interference No. 105,240

## APPENDIX C TO NI SUBSTANTIVE MOTION 3
### (To Change Benefit Accorded for the Contested Subject Matter)

### HGS Priority Application Family Tree



**APPENDIX D TO NI SUBSTANTIVE MOTION 3**
**(To Change Benefit Accorded for the Contested Subject Matter)**

**COMPARISON OF AMINO ACID NUMBERING SCHEMES FOR SEQ ID NO:2**
**(Original numbering of March 17, 1997 priority application on top;**
**numbering of involved patent on bottom; ECD is highlighted)**

```
  1 MEQRGQNAPAASGARKRHGPGPREARGARPGPRVPKTLVLVVAAVLLLVS    50
-51 MEQRGQNAPAASGARKRHGPGPREARGARPGPRVPKTLVLVVAAVLLLVS    -2

 51 AESALTTCQDLAPQQRAAPQQKRSSPESEGLCPPGHHISEDGRDCISCKYG   100
 -1 AESALTTCQDLAPQQRAAPQQKRSSPESEGLCPPGHHISEDGRDCISCKYG    49

101 QDYSTHWNDLLFCLRCTRCDSGEVELSPCTTTRRNTVCQCEEGTFREDDSP   150
 50 QDYSTHWNDLLFCLRCTRCDSGEVELSPCTTTRRNTVCQCEEGTFREDDSP    99

151 EMCRKCRTGCPRGMVKVGDCTPWSDIECVHKESGIIIGVTVAAVVLIVAV    200
100 EMCRKCRTGCPRGMVKVGDCTPWSDIECVHKESGIIIGVTVAAVVLIVAV    149

201 FVCKSLLWKKVLPYLKGICSGGGGDPERVDRSSQRPGAEDNVLNEIVSIL    250
150 FVCKSLLWKKVLPYLKGICSGGGGDPERVDRSSQRPGAEDNVLNEIVSIL    199

251 QPTQVPEQEMEVQEPAEPTGVNMLSPGESEHLLEPAEAERSQRRRLLVPA    300
200 QPTQVPEQEMEVQEPAEPTGVNMLSPGESEHLLEPAEAERSQRRRLLVPA    249

301 NEGDPTETLRQCFDDFADLVPFDSWEPLMRKLGLMDNEIKVAKAEAAGHR   350
250 NEGDPTETLRQCFDDFADLVPFDSWEPLMRKLGLMDNEIKVAKAEAAGHR   299

351 DTLYTMLIKWVNKTGRDASVHTLLDALETLGERLAKQKIEDHLLSSGKFM   400
300 DTLYTMLIKWVNKTGRDASVHTLLDALETLGERLAKQKIEDHLLSSGKFM   349

401 YLEGNADSAMS                                          411
350 YLEGNADSAMS                                          360
```